D. Mark KATZ, Appellant,

v.

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, Appellee.**

No. 94–5265.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1995.

Decided Nov. 14, 1995.

Lucinda A. Sikes, Washington, DC, argued the cause for appellant. With her on the briefs was Michael E. Tankersley, Washington, DC.

Douglas N. Letter, Litigation Counsel, U.S. Department of Justice, Washington, DC, argued the cause for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, Leonard Schaitman, Attorney, U.S. Department of Justice, and Amy E. Krupsky, Attorney, National Archives and Records Administration, Washington, DC.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

D. Mark Katz appeals from the district court's decision, on summary judgment, rejecting his claim that the National Archives and Records Administration violated the Freedom of Information Act, 5 U.S.C. § 552, by failing to honor his request for "any and all photographs relevant to the autopsy" of President John F. Kennedy. Because these items were not agency records under the control of the Archives, we affirm.

I

After President Kennedy's assassination on November 22, 1963, his body was flown to Washington, D.C., and taken to the Bethesda Naval Hospital where federal doctors performed an autopsy. REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT JOHN F. KENNEDY 59–60 (1964). Navy personnel took photographs and x-rays of the body. Captain J.H. Stover, Commanding Officer of the U.S. Naval Medical School, delivered the exposed photographic film to Roy Kellerman, a Secret Service agent. At the same time, Commander John H. Ebersole, Acting Chief of Radiology, turned over the x-ray film to Kellerman. Vice Admiral George Burkley, the President's personal physician, "accepted and approved" these actions.

Early the next morning, November 23, 1963, Kellerman delivered the exposed photographic and x-ray film to Secret Service agent Robert Bouck at the Executive Office Building. During the next few weeks, Secret Service personnel had the photographic film developed at the U.S. Navy Photographic Laboratory and returned the film and the prints to the Secret Service office in the Executive Office Building. For the next 17 months, the autopsy photographs and x-rays were stored in a safe in the Secret Service office in the Executive Office Building.

On April 22, 1965, Senator Robert F. Kennedy wrote to White House physician Admiral Burkley "authoriz[ing]" him to release to Senator Kennedy's custody "all of the material of President Kennedy, of which you have personal knowledge, and now being held by the Secret Service." Senator Kennedy requested that Admiral Burkley personally accompany the material and turn it over to Evelyn Lincoln at the National Archives. Senator Kennedy further stated that Mrs. Lincoln was not authorized to release the material to anyone without his written permission. At that time, Mrs. Lincoln, who had been President Kennedy's secretary, occupied a courtesy office in the National Archives building, but was not a government employee. *Investigation of the Assassination of President John F. Kennedy, Appendix to Hearings Before the House Select Comm. on Assassinations*, 95th Cong., 2d Sess., Vol. VII, at 25–26 (1979) (*"House Select Comm. Appendix"*). The materials, including the photographs and the x-rays, paraffin blocks of tissue samples, blood smears taken during various periods of President Kennedy's life, and other items, were transferred to Mrs. Lincoln in a locked footlocker on April 26, 1965. No key accompanied the footlocker and the contents were not divulged to officials of the Archives.

In November 1965, Congress passed a statute providing for the acquisition of "all right, title, and interest" in evidence pertaining to the assassination. Pub.L. No. 89–318, 79 Stat. 1185 (1965). The statute gave the Attorney General one year to determine which items to acquire and provided a cause

of action for owners of the items to obtain just compensation.

In September 1966, in response to a letter from Dr. John Nichols, Admiral Burkley stated that all medical records, other than those supplied to the Warren Commission, were "being held under the same conditions as the President's private papers."

In October 1966, Attorney General Ramsey Clark asked Senator Robert F. Kennedy about the government's obtaining the autopsy photographs and x-rays pursuant to the 1965 statute. Senator Kennedy "was not sympathetic to the Government's need to acquire the autopsy material." *House Select Comm. Appendix* at 28. After "heated negotiations," the Kennedy family agreed to donate the autopsy photographs and x-rays to the United States pursuant to the Presidential Libraries Act (then codified at 44 U.S.C. § 397(e)(1) (1964)).* *House Select Comm. Appendix* at 28. The deed's restrictions were "to continue in effect during the lives of the late President's widow, daughter, son, parents, brothers, and sisters, or any of them." Only federal government officials investigating the death of President Kennedy or "recognized expert[s] in the field of pathology or related areas of science or technology, for serious purposes relevant to the investigation" of the death of President Kennedy were to be permitted access to the autopsy photographs and x-rays. Burke Marshall—the Kennedy family representative—was given authority to decide whether an expert seeking access to the materials had the requisite qualifications and purpose. The photographs and x-rays were transferred to officials at the National Archives on October 31, 1966.

In 1992, Congress passed the President John F. Kennedy Assassination Records Collection Act ("JFK Act"), in order to collect all government assassination records in the Archives and to provide for their timely public disclosure. Pub.L. No. 102–526, § 2(b), 106 Stat. 3443 (1992) (codified at 44 U.S.C. § 2107 note (Supp. IV 1992)). In defining what constituted an "assassination record" subject to disclosure, the JFK Act specifically excluded "autopsy records donated by the Kennedy family to the National Archives pursuant to a deed of gift regulating access to those records." Pub.L. No. 102–526, § 3(2), 106 Stat. 3443, 3444 (1992).

## II

■ Under FOIA, an agency must make "agency records" available to the public unless they fall within one of the statutory exemptions. 5 U.S.C. § 552(a)(3), (a)(4)(B). Are the autopsy photographs and x-rays Katz requested "agency records"? To be so considered, an agency of the government must have created or obtained the records; and an agency must "be in control of the requested materials at the time the FOIA request is made." *U.S. Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 145, 109 S.Ct. 2841, 2848, 106 L.Ed.2d 112 (1989). When Katz submitted his FOIA request, the Archives was not in control of the autopsy x-rays and photographs, or so it argues; the Kennedy family, pursuant to the deed conveying these materials to the federal government, controlled who could see them.

Katz answers that the deed is invalid. His argument is this. When the records were created they were "agency records" under the Records Disposal Act, ch. 5, 57 Stat. 380–83 (1943) (codified as amended at 44 U.S.C. §§ 3301–3314), because they were "made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business." 44 U.S.C. § 3301. The Navy created the records and the Secret Service received them as part of the official investigation into the death of President Kennedy. The x-rays and photographs never became the property of President Kennedy's estate because the government never alienated these items or transferred its ownership rights in them in accordance with the rather complicated provisions of the Records Disposal Act. Since

---

* The version of the Presidential Libraries Act then in effect required that documents acquired under the Act be held "subject to such restrictions respecting their availability and use as may be specified in writing by the donors or depositors, ... and such restrictions shall be respected for so long a period as shall have been specified...." 44 U.S.C. § 397(f)(3) (1964). These provisions are now codified as amended at 44 U.S.C. §§ 2111(1), 2112(c).

the estate never owned the materials, the deed of gift is not binding on the Archives.

■ We do not address most of Katz's argument because we disagree with his initial premise. Indeed, we find that the photographs and x-rays were personal presidential materials when they were first created, and therefore at no time were they *ever* agency records. As a result, we need not consider the validity of the deed of gift.

We determined in *Nixon v. United States,* 978 F.2d 1269 (D.C.Cir.1992), that before the Presidential Records Act of 1978, Pub.L. No. 95–591, 92 Stat. 2528 (codified as amended at 44 U.S.C. §§ 2201–2207), each President had considered his presidential papers to be his property, which he could freely alienate or even destroy. We did not there say exactly what constituted "presidential papers," and until 1978, there was no legal definition of the phrase. We therefore looked to history, custom and usage, including practices of past Presidents and their families, the treatment of presidential papers by other government officials, and the apparent affirmation of presidential ownership by Congress. *Nixon,* 978 F.2d at 1277–84.

While the autopsy x-rays and photographs may satisfy the literal definition of "agency records" under the Records Disposal Act—they were "made or received by an agency"—the strong tradition of presidential ownership of their personal papers, the nature of these x-rays and photographs, and their treatment as the property of the estate of the late President demonstrate that the materials were personal presidential papers and not agency records.

The x-rays and photographs are medical records, which are usually considered private. *See, e.g.,* 5 U.S.C. § 552(b)(6) (exempting "medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" from disclosure under FOIA). Everyone involved with the creation and handling of the materials treated them as though they were the property of President Kennedy's estate, which members of the Kennedy family administered. Mrs. Kennedy was given a choice of where she wanted the autopsy to be performed. She chose the Bethesda Naval Hospital because President Kennedy had served in the Navy. Admiral Burkley, the President's personal physician, was present at the autopsy. He personally "accepted and approved" the transfer of the photographic and x-ray film from the Navy doctors to the Secret Service agents. The film was taken to and stored in the Secret Service office in the White House complex, not to Secret Service headquarters or to FBI headquarters.

Out of concern for the Kennedy family's privacy, Chief Justice Earl Warren, who was chairman of the Commission investigating the assassination, made sure that the x-rays and photographs did not become a part of the record of the Warren Commission. He "instructed that the pictures be removed from the commission's file of documents and be made available only with the consent of the Kennedys." G. EDWARD WHITE, EARL WARREN: A PUBLIC LIFE 199–202 (1982).

When Senator Kennedy "authorized" the transfer of the material to Mrs. Lincoln, neither Dr. Burkley nor anyone in the Secret Service hesitated. Senator Kennedy's letter was dated Thursday, April 22, 1965; the files were taken to Mrs. Lincoln the following Monday, April 26, 1965. Mrs. Lincoln was not a government employee at the time. No one at the Archives had access to the x-rays or photographs; no one there had a key to the footlocker; and until the contents were transferred to the Archives under the deed, no one at the Archives even knew what was in the footlocker. In a letter dated September 1, 1966, Admiral Burkley stated that the x-rays and photographs were "being held under the same conditions as the President's private papers."

The 1965 statute, and the actions of Attorney General Clark and the Archives in connection with the statute provide further support for the conclusion that the materials were considered the private property of President Kennedy's estate. The statute provided that the government could *acquire* title to the material and gave the owners of the material an action for compensation. Attorney General Clark proceeded under this statute, indicating the position of the Department of Justice that the Kennedy estate had

title to the property. Rather than arguing that the documents belonged to the federal government or simply taking the documents under the 1965 statute, the Attorney General accepted the Kennedy family's donation of the materials to the Archives subject to the terms of the deed.

Some of the materials acquired by the Navy doctors and the Secret Service during the autopsy, including microscopic tissue slides and other tissue samples, were apparently removed by Senator Kennedy between April 1965 and October 1966. *House Select Comm. Appendix* at 26–33. These items appeared on the inventory of materials transferred to Mrs. Lincoln but were not later transferred to the Archives under the deed. There is no indication that Attorney General Clark ever sought to obtain these tissue samples, or that anyone ever challenged Senator Kennedy's right to remove them.

In addition, the actions of the Archives since the photographs were deeded to the United States support the validity of the deed. For almost thirty years, the Archives has consistently obeyed the requirements of the deed. The Archives has granted access to federal government investigators, including researchers from the 1978 House Select Committee on Assassinations, the 1975 Rockefeller Commission, and a review panel appointed by Attorney General Ramsey Clark in 1968. But the Archives has also denied private researchers access to the x-rays and photographs. Soon after the deed was executed, the Archives denied a FOIA request from Dr. John Nichols. In Nichols' action for injunctive relief, the Tenth Circuit agreed with the Archives that the 1966 deed—not FOIA—governed and that Nichols did not have standing under FOIA to challenge the validity of the deed. *Nichols v. United States,* 460 F.2d 671 (10th Cir.), *cert. denied,* 409 U.S. 966, 93 S.Ct. 268, 34 L.Ed.2d 232 (1972).

Congress itself implicitly recognized that the autopsy records were personal presidential papers. It specifically excluded them from disclosure under the JFK Act. The Act defined the phrase "assassination record" broadly to include any record related to the assassination "that was created or made

available for use by, obtained by, or otherwise came in the possession of ... any ... office of the Federal Government." Pub.L. No. 102–526, § 3(2), 106 Stat. 3443, 3444 (1992). The only exceptions to this definition are the records governed by the deed. Clearly these records are unique. Congress assumed that the Kennedy estate owned the records, that the deed was valid, and that the terms of the deed offered the best mechanism for providing access to the materials while honoring the intentions of the Kennedy family. According to the Senate Report, the Committee "carefully examined the deed of gift" and concluded that the terms of the deed would "rightfully balance the needs for access by professionals with the privacy protection intended by the terms of the deed." S.REP. No. 328, 102d Cong., 2d Sess. 22 (1992).

Thus, all agencies and individuals involved in the creation and handling of the x-rays and photographs—the Secret Service, Admiral Burkley, the Archives, Chief Justice Warren, Attorney General Clark, and the Kennedy family—treated these items as though they were the personal property of the Kennedy estate. This understanding and the actions taken consistent with it were essentially ratified by Congress in the 1992 JFK Act. While the mere assumptions of parties might not normally be dispositive, in the absence of any clear statutory, constitutional, or common law guidance and in light of the strong tradition of presidential ownership of personal papers, we believe that the assumption here was warranted.

Because we hold that the autopsy x-rays and photographs were presidential papers and not agency records, we affirm the district court's judgment that the documents are not subject to disclosure under FOIA.

*Affirmed.*