James CAMPBELL, Appellant,

v.

UNITED STATES DEPARTMENT OF JUSTICE, Appellee.

No. 97–5269.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 19, 1998.

Decided Dec. 29, 1998.

As Amended on Denial of Rehearing March 3, 1999.

James H. Lesar argued the cause and filed the briefs for appellant.

Fred E. Haynes, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney. Brian J. Sonfield, Assistant U.S. Attorney, entered an appearance.

Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

James Campbell appeals from the grant of summary judgment to the Department of Justice in an action under the Freedom of Information Act ("FOIA") seeking Federal Bureau of Investigation ("FBI") records about author and civil rights activist James Baldwin. Campbell contends that the FBI has conducted an inadequate search for documents responsive to his FOIA request, that the declarations in support of the FBI's invocation of FOIA's national security and law enforcement exemptions are insufficiently detailed to establish the absence of a genuine dispute of material fact, and that the district court erred in affirming the FBI's denial of Campbell's request for a complete waiver of fees. We agree with these contentions, in part because this circuit's FOIA jurisprudence has advanced while the lawsuit has stood relatively still, and we therefore reverse and remand the case to the district court for further proceedings.

I.

This case arises from a scholar's efforts to unearth artifacts from an awkward period in the history of the FBI. *See, e.g.,* *Hobson v. Wilson,* 737 F.2d 1, 9–13 (D.C.Cir.1984) (describing the FBI's COINTELPRO investigations). In 1988, Appellant James Campbell was writing a biography about James Baldwin, a noted author and leader in the civil rights movement. To obtain information for use in his forthcoming book, Campbell submitted a FOIA request to the New York office of the FBI in which he sought "the FBI file" on Baldwin. The parties exchanged correspondence and the New York and national FBI offices identified and produced a limited number of responsive documents, often in redacted form. These documents, only some of which are in the appellate record, suggest that the FBI monitored Baldwin's civil rights activities and contacts with alleged communists during the 1960s. The parties eventually reached an impasse about the scope of the FBI's disclosure obligations. After exhausting his administrative remedies, Campbell filed suit in November 1989 for injunctive relief compelling the Justice Department to produce requested documents and waive copying fees. Over the course of the next year, the FBI released additional documents. In 1991, Campbell published "Talking at the Gates: A Life of James Baldwin."

Between 1991 and 1996, Campbell's case languished in district court as various stays permitted the FBI to review documents and respond to new judicial interpretations of FOIA. In September 1996, the district court partially granted the Justice Department's motion for summary judgment. The court concluded that the FBI had conducted an adequate search, properly invoked exemptions to FOIA, and established an appropriate copying fee. After conducting an *in camera* inspection of a file labeled "miscellaneous law enforcement," the court also concluded that the Department had properly invoked FOIA's law enforcement exemption, and in August 1997 granted summary judgment to the Department on that file as well. The court denied Campbell's cross motion for

summary judgment, except with regard to a limited category of information related to certain investigative techniques that the court ordered be disclosed. Campbell appeals the September 1996 and August 1997 summary judgment orders.

## II.

■■■ **A. Adequacy of the search.** Viewing the FOIA terrain with an eye toward providing guidance to agencies consistent with congressional intent, the court explained with respect to an adequacy-of-search claim in *Oglesby v. United States Dep't of the Army*, 920 F.2d 57 (D.C.Cir. 1990), that "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.* at 68. "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Department of State*, 897 F.2d 540, 542 (D.C.Cir.1990). The court applies a "reasonableness" test to determine the "adequacy" of a search methodology, *Weisberg v. United States Dep't of Justice*, 705 F.2d 1344, 1351 (D.C.Cir.1983), consistent with congressional intent tilting the scale in favor of disclosure. *See, e.g., John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151–52, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989).

■■ The record indicates that the FBI limited its search for information about James Baldwin to files that it could locate by searching its Central Records System (CRS) index, which is capable of locating most, but not all, documents responsive to a general request for information about a particular subject. The district court rejected Campbell's claim that the FBI had conducted an inadequate search because it failed to check a separate electronic surveillance (ELSUR) index and to search for "tickler"[1] files even though documents that the FBI did produce alluded to potentially responsive ELSUR and tickler records.[2] The FBI has not offered any evidence to rebut Campbell's claim that some of the Bureau's documents suggest— through administrative annotations and express references in the text[3]—that searching the ELSUR index, or searching for ticklers, would have identified additional information about James Baldwin.[4] Instead, the FBI contends that ELSUR and tickler searches are unnecessary in the vast majority of cases, and that it therefore need not conduct such searches unless expressly asked to do so in a FOIA request. Because Campbell's request asked only for "the FBI file" on Baldwin, the FBI maintains that it acted reasonably by searching only the CRS index.

■■■ We will assume that the FBI's characterization of ELSUR and tickler searches is correct, and that such searches rarely uncover information beyond the scope

---

1. A "tickler" is a duplicate file containing copies of documents, usually kept by a supervisor. Such files can be of interest to a FOIA requester because they could contain documents that failed to survive in other filing systems or that include unique annotations.

2. Our review of the record indicates that Campbell properly raised this claim in the district court. We therefore reject the Department's waiver defense. *See District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084–85 (D.C.Cir. 1984).

3. For example, document 147A on the Vaughn index bears a notation showing that it was routed to "Supervisor #42." Campbell has submitted unrebutted evidence that such a notation indicates the existence of a tickler file. Lesar Decl.

¶ 3. Of course, to the extent that the FBI can demonstrate that this reference suggests the existence of only a particular type of tickler file, or one located in a particular place, it need not search for all tickler files that might be located anywhere; the scope of the FBI's search for ticklers need only be as broad as is reasonable in light of the evidence compelling such a search.

4. The record suggests that the New York FBI office—as opposed to FBI Headquarters—did search its local ELSUR index. At oral argument, however, the Department was not able to confirm that such a search occurred. This factual ambiguity is not material on appeal because even if the New York office had searched its ELSUR index, the national office would still have been obliged to search its own index if it had cause to believe that such a search would identify responsive information.

of a CRS search. It follows from this assumption that in most cases, the FBI need not conduct ELSUR and tickler searches when the FOIA requester does not expressly ask it to do so. FOIA demands only a reasonable search tailored to the nature of a particular request. When a request does not specify the locations in which an agency should search, the agency has discretion to confine its inquiry to a central filing system if additional searches are unlikely to produce any marginal return; in other words, the agency generally need not "search every record system." *Oglesby*, 920 F.2d at 68.

■ However, an agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Id.* An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is "reasonable" in a particular case to account for leads that emerge during its inquiry. Consequently, the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than what the agency speculated at its inception. Here, the FBI started with the reasonable assumption that only a CRS review would be necessary, but that assumption became untenable once the FBI discovered information suggesting the existence of documents that it could not locate without expanding the scope of its search. *Cf. Kowalczyk v. Department of Justice*, 73 F.3d 386, 389 (D.C.Cir.1996). In resisting this conclusion, the Department

maintains that the "weight of authority" justifies refusing to supplement a CRS search with an ELSUR search unless specifically asked to do so within the FOIA request. In fact, such authority indicates that the FBI must search ELSUR in addition to CRS in response to a general FOIA request for which ELSUR may be relevant. *See Biberman v. FBI*, 528 F.Supp. 1140, 1144–45 (S.D.N.Y.1982); *Larouche v. Webster*, 1984 WL 1061, *2 (S.D.N.Y.1984); *cf. Schrecker v. United States Dep't of Justice*, 14 F.Supp.2d 111, 119 (D.D.C.1998). Moreover, the FBI appears in many cases to have searched ELSUR without being asked to do so. *See Hart v. FBI*, 1996 WL 403016 at *2 (7th Cir.1996); *Marks v. United States*, 578 F.2d 261, 263 (9th Cir.1978); *Canning v. United States Dep't of Justice*, 848 F.Supp. 1037, 1050 (D.D.C.1994).[5]

■ The Department also asserts that the existence of ticklers in its archives is "speculative" because ticklers are not generally preserved for posterity and also might not contain information distinct from what the FBI already found within the CRS. It is true that Campbell has claimed only that a tickler existed at one time, not that it exists today or that it contains unique information. Yet in any FOIA request, the existence of responsive documents is somewhat "speculative" until the agency has finished looking for them. As the relevance of some records may be more speculative than others, the proper inquiry is whether the requesting party has established a sufficient predicate to justify searching for a particular type of record. *Cf. Meeropol v. Meese*, 790 F.2d 942, 953

---

5. Other cases on which the Department relies do not support its argument. In *Frydman v. Department of Justice*, 852 F.Supp. 1497 (D.Kan.1994), *aff'd mem.*, 57 F.3d 1080 (10th Cir.1995), the district court criticized the FBI's failure to search ELSUR until specifically requested to do so, but held that the lapse was not "bad faith" within the context of the plaintiff's claim for attorney's fees. 852 F.Supp. at 1505–06. This holding is hardly an endorsement of the Department's position. In *Ferguson v. Kelly*, 455 F.Supp. 324 (N.D.Ill.1978), the court denied plaintiff's motion for reconsideration of summary judgment in light of plaintiff's recent discovery of the existence of ELSUR. The odd procedural posture of *Ferguson*, coupled with its thin reasoning, render it an unpersuasive precedent. Finally, the Department cites three cases for the general proposition that a CRS search is a sufficient response to a general FOIA request that does not identify specific locations to search. *See Master v. FBI*, 926 F.Supp. 193, 196 (D.D.C.1996), *aff'd mem.*, 124 F.3d 1309 (D.C.Cir.1997); *Lawyers Comm. for Human Rights v. INS*, 721 F.Supp. 552, 566–67 & n. 12 (S.D.N.Y.1989); *Friedman v. FBI*, 605 F.Supp. 306, 311 (N.D.Ga.1981). None of these opinions indicates that the plaintiff had objected to the lack of an ELSUR search or that such a search might have been productive; indeed, none even mentions ELSUR.

(D.C.Cir.1986). Here, the FBI does not deny that such a predicate exists, rendering its "speculation" claim irrelevant. *Cf. Oglesby v. United States Dep't of the Army,* 79 F.3d 1172, 1185 (D.C.Cir.1996); *Schrecker,* 14 F.Supp.2d at 119.

 For these reasons we conclude that the district court erred in finding that an adequate search had been made, and remand the case so that the FBI can be afforded an opportunity to search for tickler and ELSUR records responsive to Campbell's FOIA request, and to proceed as the results of such searches require.[6]

**B. Exemption 1 (National Security).** FOIA authorizes an agency to withhold requested material if it is "properly classified" in the "interest of national defense or foreign policy" pursuant to an applicable executive order. 5 U.S.C. § 552(b)(1). In the instant case, the FBI invoked the national security exemption to redact documents and withhold at least two entire documents. The sole justification in the record for the FBI's classification decision is a nine-year old declaration from Special Agent Earl E. Pitts generally attesting to the sensitivity of the withheld information and the general importance of safeguarding national security. On appeal, Campbell contends both that the district court failed to require the FBI to reevaluate its classifications under a new executive order and that the Pitts declaration is "too conclusory to support summary judgment." We find no error with regard to the executive order applied but agree that the district court erred in concluding that the Pitts declaration was sufficiently detailed to support withholding disclosure of certain materials.

 On the threshold issue of which executive order governs the FBI's national security determinations, the Department favors application of E.O. 12356 ("the Reagan Order"), which was in effect at the time that the FBI made the classification decisions at issue in this case, while Campbell proposes E.O. 12958 ("the Clinton Order"), which took effect during the pendency of the district court proceedings. A district court may, upon request by an agency, permit the agency to apply a superceding executive order during the pendency of FOIA litigation. *See Baez v. United States Dep't of Justice,* 647 F.2d 1328, 1334 (D.C.Cir.1980). However, absent a request by the agency to reevaluate an exemption 1 determination based on a new executive order, the district court may not require the agency to apply the new order; instead, the court must evaluate the agency's decision under the executive order in force at the time the classification was made. *See King v. United States Dep't of Justice,* 830 F.2d 210, 216–17 (D.C.Cir.1987); *Lesar v. United States Dep't of Justice,* 636 F.2d 472, 480 (D.C.Cir.1980). This rule prevents undue delay and burden in the resolution of FOIA claims by introducing an element of finality into agency decisionmaking. *See Lesar,* 636 F.2d at 480. It follows that the district court properly applied the Reagan Order because the FBI did not seek leave to reconsider its position in light of the Clinton Order.

However, *Lesar* did not purport to create a general rule about the non-applicability of superceding executive orders in ongoing FOIA cases. Rather, the opinion relied in part on an interpretation of the superceding executive order, which the court found to be expressly prospective because it preserved all classification decisions made under prior orders. *See id.* The mere fact that the Clinton Order came into force after the classification decisions in the instant case therefore does not in and of itself preclude application of the Order under *Lesar.* Instead, the question is whether the Clinton Order calls prior classification decisions under the Reagan Order into question.[7] We conclude that

---

6. Campbell also challenges the adequacy of the FBI's search because it failed to locate two documents that the FBI provided to other FOIA requesters and one document that the FBI apparently lost. While any omission in a FOIA search is potentially troubling, the inadvertent omission of three documents does not render a search inadequate when the search produced hundreds

of pages that had been buried in archives for decades. *See Meeropol,* 790 F.2d at 952–53.

7. This reasoning is consistent with *King,* which has language in it that appears to characterize *Lesar* as creating a per se rule applicable to all future transitions between executive orders. *See* 830 F.2d at 217. A careful reading of *King*

the Clinton Order does not permit FOIA litigants to reopen classification decisions finalized before the Order's effective date. As with the order reviewed in *Lesar*, the Clinton Order defines classified information to include information classified under prior orders. *See* E.O. 12958 § 1.1(c). Moreover, the Clinton Order does not contain any provision that requires an agency to reconsider classification decisions in pending FOIA litigation.

Campbell nevertheless contends that the Clinton Order is "remedial" and therefore requires a remand. Executive orders that replace a prior order are likely to be remedial in that they correct some perceived deficiency in the prior regime. Thus, the relevant question is not whether the new order materially differs from the old, but rather whether the new order confines its disagreement with the past to remedies that operate in the future, or instead creates a retrospective remedy that allows a FOIA litigant to reopen an otherwise final review. While, as Campbell observes, the Clinton Order substantially alters the process for declassifying relatively old documents, *see, e.g.*, E.O. 12958 §§ 3.3(e) & 3.6, nothing in the Order requires the district court to apply the new standards in a pending FOIA action.

■■■ Turning to the merits of Campbell's challenge to the FBI's decisions under exemption 1, we note that the Department's sole explanation and defense of the FBI's exemption 1 classifications is the Pitts declaration and accompanying appendices.[8] An agency bears the burden to justify exemptions under FOIA. *See PHE, Inc. v. Department of Justice*, 983 F.2d 248, 250 (D.C.Cir. 1993). One way to discharge this burden is to submit a declaration from an appropriately qualified official attesting to the basis for the agency's decision. In the context of national security exemptions, such declarations merit

"substantial weight." *King*, 830 F.2d at 217; *Military Audit Project v. Casey*, 656 F.2d 724, 737 (D.C.Cir.1981). However, deference is not equivalent to acquiescence; the declaration may justify summary judgment only if it is sufficient "to afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *King*, 830 F.2d at 218. Among the reasons that a declaration might be insufficient are lack of detail and specificity, bad faith, and failure to account for contrary record evidence. *See id.* Here, only detail and specificity are at issue.

■■■ To justify summary judgment, a declaration must provide detailed and specific information demonstrating "that material withheld is logically within the domain of the exemption claimed." *King*, 830 F.2d at 217. "[A]n affidavit that contains merely a 'categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate.'" *PHE*, 983 F.2d at 250 (quoting *King*, 830 F.2d at 224). Or as the court stated in *Hayden v. National Sec. Agency*, 608 F.2d 1381, 1387 (D.C.Cir.1979), "the affidavits must show, with reasonable specificity, why the documents fall within the exemption. The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Id.* (footnote omitted). These requirements are consistent with the agency's general obligation to create "as full a public record as possible, concerning the nature of the documents and the justification for nondisclosure." *Id.* at 1384.

The Pitts declaration cannot satisfy the foregoing standards. Notably, the Pitts declaration does not contain any specific reference to Baldwin or any other language suggesting that the FBI tailored its response to

---

reveals, however, that the court expressly recognized that *Lesar* relied on a "carry-over provision" in the superceding executive order that preserved classification decisions made under the prior order. *Id.* at 216.

**8.** The appendices consist of redacted documents marked with a coded annotation and a catalog explaining the meaning of each code. Campbell suggests that this system of marking documents

is inherently flawed. However, the court has previously stated that this methodology for explaining classification decisions can be sufficient provided that it complies with the substantive requirements noted above, which are applicable to any methodology for processing FOIA exemptions. *See Keys v. United States Dep't of Justice*, 830 F.2d 337, 349–50 (D.C.Cir.1987).

a specific set of documents. *Cf. Wiener v. FBI*, 943 F.2d 972, 979 (9th Cir.1991). More importantly, the declaration fails to draw any connection between the documents at issue and the general standards that govern the national security exemption. For example, the declaration states that "[a]ll of the intelligence activities or methods detailed in the withheld information are currently utilized by the FBI" and that disclosure of intelligence methods is undesirable. However, the declaration makes no effort to assess how detailed a description of these Hoover-era methods the documents provide, and whether disclosure would be damaging in light of the degree of detail. Similar failures to connect general statements about the content of the withheld documents with general standards for classifying information appear elsewhere in the declaration.

 The Department's explanation for the declaration's lack of detail is that providing more detail would "risk[ ] the disclosure of the very information that the FBI was attempting to protect." The court has acknowledged that requiring too much detail in a declaration could defeat the point of the exemption, but concluded nonetheless that in most cases the agency should not have difficulty describing the context and nature of the withheld information without revealing its substance. *See Hayden*, 608 F.2d at 1385. Only in special circumstances, such as those surrounding the intelligence mission of the National Security Agency, can even minimal detail itself constitute sensitive information. *See id.*[9] Here the information appears to describe no more than routine FBI surveillance and monitoring techniques. Such activity no doubt generates material that may properly be classified and withheld under FOIA, but it is implausible to baldly assert that such material is so sensitive that the FBI is incapable of providing any descriptive information. Likewise, summary judgment was inappropriate with respect to two documents, comprising six pages, that the FBI withheld without providing any details (including date) in the Pitts declaration[10] or elsewhere because a conclusory assertion that material is exempt and nonsegrable is insufficient to support nondisclosure. *See, e.g., Kimberlin v. Department of Justice*, 139 F.3d 944, 950 (D.C.Cir.1998).

 On remand, the district court can either review the documents in camera or require the FBI to provide a new declaration. *See PHE*, 983 F.2d at 253. The latter course is favored where agency affidavits are facially inadequate; otherwise the district court is effectively left to speculate about why an agency may be able to classify a document and cannot review a concrete classification decision.[11] *See id.* A new declaration need not exhaustively explain each redaction and withholding, but it must provide sufficient information to permit Campbell and the district court to understand the foundation for and necessity of the FBI's classification decisions. *See King*, 830 F.2d at 218.

**C. Exemption 7 (Law Enforcement).** FOIA exempts from disclosure six categories of documents that have been "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7)(A)-(F). The FBI withheld infor-

9. In such circumstances, "the solution is for the court to review the document in camera" rather than passively accept an agency's unsubstantiated exemption 1 defense. *Simon v. Department of Justice*, 980 F.2d 782, 784 (D.C.Cir.1992).

10. The Department's brief cites paragraphs 22 and 23 of the Pitts declaration to support withholding these two documents, but the cited paragraphs are boilerplate that make no reference to the disputed material. Indeed, paragraphs 22 and 23 apply solely to material that was redacted rather than entirely withheld because they invite the reader to review unredacted portions of documents to discern the "context" for the deletions. Such review is of course impossible here.

11. In preparing a new declaration on remand, the FBI's new declarant (assuming that Mr. Pitts is no longer available) presumably must re-review the redactions and withholdings. The Clinton Order will govern this review. *See King*, 830 F.2d at 216; *Afshar v. Department of State*, 702 F.2d 1125, 1137 (D.C.Cir.1983). This rule is consistent with our reasoning in *Lesar*: when an agency has completed a FOIA review, principles of finality weigh against ordering a new review under a new order, but when a court orders a new review on other grounds, respect for the President's authority to define national security priorities requires that the new review proceed under current law rather than the superceded law of a prior administration. *See King*, 830 F.2d at 217.

mation based on various sub-categories of this law enforcement exemption. The district court concluded that the withheld information was compiled for a law enforcement purpose and fit within one of the subcategories within exemption 7. With respect to all but one set of documents, the district court relied on the FBI's declarations. However, the district court did not find the declarations adequate to justify withholding a file labeled "miscellaneous law enforcement" and instead conducted an *in camera* review, thereafter concluding that most of the file had been properly withheld, but ordering a small supplemental disclosure to Campbell.[12]

On appeal, Campbell contends first, that the FBI's declarations were insufficient to establish a rational nexus between the withheld material and a legitimate law enforcement purpose, and second, that information was improperly withheld under exemptions 7(C) (invasion of personal privacy) and 7(D) (disclosure of confidential sources). We agree with Campbell's first contention and therefore remand to the district court for further development of the record. With that remand in mind, and in the hope of bringing resolution to this 1988 FOIA request, we comment briefly on Campbell's 7(C) and 7(D) contentions.

■ Because the FBI specializes in law enforcement, its decision to invoke exemption 7 is entitled to deference. *See Pratt v. Webster,* 673 F.2d 408, 419 (D.C.Cir. 1982). This court's "deferential" standard of review is not, however, "vacuous." *Id.* at 421. If the FBI relies on declarations to identify a law enforcement purpose underlying withheld documents, such declarations must establish a rational "nexus between the investigation and one of the agency's law enforcement duties," *id.* at 421, and a connection between an "individual or incident and a possible security risk or violation of federal law." *Id.* at 420. If the declarations "fail to supply facts" in sufficient detail to apply the

*Pratt* rational nexus test, then a court may not grant summary judgment for the agency. *Quinon v. FBI,* 86 F.3d 1222, 1229 (D.C.Cir. 1996); *see also Davin v. United States Dep't of Justice,* 60 F.3d 1043, 1056 (3d Cir.1995).

■ The Department has identified only two facts to establish that documents relating to James Baldwin were compiled for a law enforcement purpose. First, the FBI relies on a declaration from Special Agent Regina Superneau in which she lists the names of the files containing withheld information. The relevant labels are: "Interstate Transportation of Obscene Material," "Security Matter—Communism," and "Internal Security."[13] The fact that information is stored inside a folder with an official-sounding label is insufficient standing alone to uphold nondisclosure. *See, e.g., Simon,* 980 F.2d at 784; *Keys,* 830 F.2d at 341. Indeed, the Department's position reduces to the long-rejected claim that anything in an FBI file pertains to an exempt law enforcement purpose. *See Pratt,* 673 F.2d at 415. At a minimum, the FBI must demonstrate the relationship between a record and its label and between the label and a law enforcement purpose.

■ Second, the Department relies on a statement in the declaration of Special Agent Debra Mack that "[t]he FBI investigation of James Baldwin was predicated upon the fact that established security sources of the FBI had indicated that James Baldwin was associating with persons and organizations which were believed to be a threat to the security of the United States." If this statement were offered to justify exemption of a particular document, it might suffice provided it contained sufficient detail about the scope of the association and the nature of the threat. The problem, however, is that the Department relies on this statement to justify every withholding from each of at least three files collected over many years on different topics

12. Although Campbell has also appealed from the district court's August 1997 order, his brief does not address the materials that the district court reviewed in camera. We therefore affirm the district court's order with respect to those exemption 7 materials.

13. The Department's brief does not reference a file labeled "Racial Matter" despite the fact that the declaration indicates that this was a law enforcement file. On remand, the district court should determine whether information was withheld from this file and whether it is related to a legitimate law enforcement purpose.

in different contexts. The FBI appears to maintain that once it can justify its investigation of a person, all documents related to that person are exempt from FOIA, even if the documents were collected for a different reason. This position is untenable. Rather, to justify summary judgment under exemption 7, the FBI must explain why each withheld document or set of closely similar documents relate to a particular law enforcement purpose. The Mack declaration does not attempt this inquiry. Thus, although the FBI may possess some documents related to a valid law enforcement investigation of James Baldwin, we cannot conclude that each withheld document about James Baldwin related to such an investigation. Absent a sufficient threshold showing that the withheld information was "compiled for law enforcement purposes," we reverse; on remand the FBI may again attempt to meet its statutory burden. *See Summers v. Department of Justice,* 140 F.3d 1077, 1083 (D.C.Cir.1998).

▌ Exemption 7(C) bars disclosures that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). An agency may not withhold records under exemption 7(C) solely because disclosure would infringe legitimate privacy interests, but must balance privacy interests against the public's interest in learning about the operations of its government. *See United States Dep't of Defense v. Federal Labor Relations Auth.,* 510 U.S. 487, 495, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994); *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 762, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). The record suggests that the FBI made an abstract attempt to identify possible public interests in disclosure and accorded these interests surprisingly little weight. This attitude is troubling given the presumption of openness inherent in FOIA, *see Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), and the obvious historical value of documents describing the FBI's role in the cold war and in the civil rights move-

ment. Undoubtedly there are important privacy rights of individuals caught in the web of a wide-ranging criminal investigation that warrant protection, but the balancing process in the instant case appears to have been somewhat of an empty formality. On remand, the FBI will have the opportunity to provide additional explanation about the relative weight of the competing public and private interests at stake, and the district court will have an opportunity to provide an analysis that will "fully articulate the balance it reaches" and resolve "fact-intensive" issues to permit "efficient and meaningful" appellate review. *Summers,* 140 F.3d at 1083.

▌ Insofar as Campbell contends that the FBI has wrongfully invoked exemption 7(C) to protect the privacy of people who are dead, two questions are presented: how does death affect the exemption 7(C) balancing calculus, and what must the FBI do to ascertain whether the persons whose privacy it seeks to protect have died. First, death clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living. A court balancing public interests in disclosure against privacy interests must therefore make a reasonable effort to account for the death of a person on whose behalf the FBI invokes exemption 7(C). *See Summers,* 140 F.3d at 1084–85 (Silberman, J., concurring); *id.* at 1085 (Williams, J., concurring); *Kiraly v. Federal Bureau of Investigation,* 728 F.2d 273, 277–78 (6th Cir. 1984).[14] The court must also account for the fact that certain reputational interests and family-related privacy expectations survive death. As was recently pointed out by the Supreme Court in *Swidler & Berlin v..United States,* —— U.S. ——, ——, 118 S.Ct. 2081, 2086, 141 L.Ed.2d 379 (1998), the attorney-client privilege survives the death of the client, who "may be concerned about reputation, civil liability, or possible harm to friends or family." This instruction by the Court would appear to undercut the conclusion of the Third Circuit in *Davin,* 60 F.3d at 1058, and *McDonnell v. United States,* 4

---

**14.** Death of a confidential source, in contrast, is not relevant under exemption 7(D). *See Schmer-*

*ler v. FBI,* 900 F.2d 333, 335–36 (D.C.Cir.1990).

F.3d 1227, 1257 (3d Cir.1993), that under FOIA deceased persons "have no privacy interest in nondisclosure of their identities." The scope and weight of these interests need not be resolved on the present record, however, although we note analysis of privacy under FOIA often differs from similar analysis in other areas of the law. *See Reporters Committee*, 489 U.S. at 762 n. 13, 109 S.Ct. 1468.

Second, the present record is insufficient to permit meaningful discussion of the extent, if any, to which the FBI must investigate to determine whether putative beneficiaries of 7(C) are alive or dead. *See Summers*, 140 F.3d at 1085 (Williams, J., concurring). On remand, the parties may document their respective positions, and the district court should order the FBI to take such action as is necessary to ensure proper implementation of exemption 7(C). To the extent Campbell has also challenged specific redactions of names or categories of names, the district court, which will have the benefit of the FBI's supplemental declarations, can initially resolve these challenges more effectively.

 Exemption 7(D) covers "records or information compiled by criminal law enforcement authorities in the course of criminal investigations if their release could reasonably be expected to disclose the identity of, as well as information provided by, a confidential source." *Computer Prof'ls for Social Responsibility v. United States Secret Serv.*, 72 F.3d 897, 905 (D.C.Cir.1996). The mere fact that a person or institution provides information to a law enforcement agency does not render that person a "confidential source" within the meaning of exemption 7(D). *See United States Dep't of Justice v. Landano*, 508 U.S. 165, 178, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993). Rather, exemption 7(D) applies only when "the particular source spoke with an understanding that the communication would remain confidential." *Id.* at 172, 113 S.Ct. 2014. Such understandings are reasonable when the law enforcement

agency receiving information provides either an express or implied assurance of confidentiality. *See id.*

The district court concluded that the FBI appropriately withheld information received from sources to whom the FBI had provided either express or implied assurances of confidentiality. The district court's reasoning with respect to the implied assurances is correct,[15] but the FBI's declarations with respect to express assurances are insufficient to warrant summary judgment.

 To withhold information under Exemption 7(D) by express assurances of confidentiality, the FBI must present "probative evidence that the source did in fact receive an express grant of confidentiality." *Davin*, 60 F.3d at 1061. Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources. *See, e.g., id.*; *Computer Prof'ls*, 72 F.3d at 906. No matter which method the agency adopts to meet its burden of proof, its declarations must permit meaningful judicial review by providing a sufficiently detailed explanation of the basis for the agency's conclusion. For, as the Supreme Court has observed in regard to mere assertions that there is a confidential source: "Once the FBI asserts that information was provided by a confidential source ... the requester—who has no knowledge about the particular source or the information being withheld—very rarely will be in a position to offer persuasive evidence that the source in fact had no interest in confidentiality." *Landano*, 508 U.S. at 177, 113 S.Ct. 2014.

The FBI declaration simply asserts that various sources received express assurances of confidentiality without providing any basis for the declarant's knowledge of this alleged

---

15. The district court concluded that local, state, and foreign law enforcement agencies, as well as a former member of an allegedly subversive organization, had cooperated with the FBI's anticommunist activities based upon an implied assurance of confidentiality. This conclusion is consistent with the record and with the Supreme Court's analysis in *Landano*. *See Landano*, 508 U.S. at 175–76, 113 S.Ct. 2014; *Ferguson v. FBI*, 83 F.3d 41, 43 (2d Cir.1996); Declaration of Debra Mack at ¶¶ 19–34.

fact. Given that the declarant presumably lacks personal knowledge of the particular events that occurred more than 30 years ago, more information is needed before the court can conclude that exemption 7(D) applies. We also note that while the FBI's declaration maintains that many documents reveal express guarantees of confidentiality on their face, some of these guarantees have been redacted or the entire document withheld, rendering judicial review impossible. On remand, the FBI can produce such additional information as is necessary to document its exemption 7(D) defenses.

### III.

Finally, Campbell challenges the fee assessment for copying certain FBI files. FOIA permits an agency to charge a reasonable fee for searching, copying, and reviewing files. *See* 5 U.S.C. § 552(a)(4)(A)(ii). The agency must waive or reduce this fee when disclosure of requested information is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). The FBI has promulgated regulations to structure its discretion under this fee waiver provision. *See* 28 C.F.R. § 16.11(d). Judicial review in "any action by a requester regarding the waiver of fees" is de novo, but is limited to the record before the agency. 5 U.S.C. § 552(a)(4)(A)(vii).

The FBI did not charge Campbell any fees for search and review related to his FOIA request, but it did charge for approximately $165 in copying expenses. Campbell did not pay the full amount because the FBI granted him a 60% fee waiver. According to the FBI, the remaining 40% of the fees were not waivable because 40% of the released documents would not further public understanding about the operations of government. Such documents were either redundant with material already in the public domain, repetitious with other material being produced, or contained administrative information of no importance to the public. If a page contained any substantive information, even if

embedded within mostly nonsubstantive material, the FBI granted a waiver.

The district court accepted the FBI's reasoning and affirmed the 60% waiver, noting that:

> Neither party disputes that FBI and CIA files of civil rights activist James Baldwin concern the 'operations or activities of the government.' Nor is it disputed that plaintiff stands to gain commercially from responsive documents. Indeed, plaintiff has already authored a biography about James Baldwin using materials responsive to his FOIA request. The court concurs with the FBI's assertion that 40% of the releasable material was not new material. As such, the court is persuaded that the material would therefore be less likely to contribute significantly to public understanding. Accordingly, the court upholds the FBI decision to grant a 60 percent partial fee waiver and charge duplication fees for the remaining 40 percent.

Memorandum Opinion at 18–19. Campbell challenges this reasoning and contends that he is entitled to a 100% fee waiver. We agree that the district court must reconsider its analysis, but we decline to hold that the FBI cannot charge Campbell any copying fees.

■■■ The district court prominently noted its view that the parties agreed "that plaintiff stands to gain commercially from responsive documents." Yet this statement is contradicted by the record, as the FBI did not take commercial profit into account when calculating a fee waiver because it concluded that Campbell "has no overriding commercial interest in this case." The FBI's reasoning is consistent with the underlying purpose of the fee waiver provisions, which afford "special solicitude" to scholars whose archival research advances public understanding of government operations. *National Treasury Employees Union v. Griffin*, 811 F.2d 644, 649 (D.C.Cir.1987). The fact that a bona fide scholar profits from his scholarly endeavors is insufficient to render his actions "primarily . . . commercial" for purposes of calculating a fee waiver, as Congress did not intend for scholars (or journalists and public interest groups) to forego compensation when acting

within the scope of their professional roles. The quasi-commercial nature of Campbell's research was therefore irrelevant for purposes of calculating an appropriate fee waiver.

▇▇▇ The district court also agreed with the FBI "that 40% of the releasable material was not new material. . . . [and] would therefore be less likely to contribute significantly to public understanding." Our review of the FBI's fee waiver decision indicates that the FBI reached this conclusion based on several flawed assumptions. For example, the FBI concluded that previously unreleased summaries by its staff of newspaper articles constitute public domain material, because the underlying articles are public, that would not further public understanding. Yet the fact that FBI work-product incorporates publicly available information does not detract from its value independent of the source material. Indeed, insight into how the FBI reacts to the media is the kind of public understanding of government operations that FOIA was designed to foster.

▇▇▇▇ The district court also accepted the FBI's contention that portions of the requested materials were already in the public domain. Yet the FBI has never explained where in the "public domain" these materials reside. Such an explanation is necessary because the mere fact that material is in the public domain does not justify denying a fee waiver; only material that has met a threshold level of public dissemination will not further "public understanding" within the meaning of the fee waiver provisions. *See, e.g., Carney v. United States Dep't of Justice*, 19 F.3d 807, 815–16 (2d Cir.1994); *Schrecker v. Department of Justice*, 970 F.Supp. 49, 50–51 (D.D.C.1997); *Fitzgibbon v. Agency for Int'l Dev.*, 724 F.Supp. 1048, 1051 (D.D.C.1989). Likewise, the FBI has not indicated how closely related the requested material was to material already in the public domain, an

omission that precludes deference to its ultimate conclusions.

▇▇▇ Furthermore, the presence of administrative material within files that also contain substantive documents does not justify charging fees for copying the non-substantive clutter. The fee waiver provisions implicitly assume that valuable government information tends not to be freestanding; few files contain neatly segregated "substantive" documents shorn from their administrative accompaniments. Congress presumably did not intend agencies to pick through responsive records to determine the percentage of the record that contains interesting morsels and to deem the remainder of the record irrelevant to public understanding. The more plausible reading of the statute is that once a given record is deemed to contain information warranting a waiver, all of the related pages within that record that are responsive to the FOIA request fall under the waiver even if each individual page would not independently qualify.[16] It would then fall to the requester—here a scholar—rather than the FBI, to parse the wheat from the chaff. *Cf. Project on Military Procurement v. Department of the Navy*, 710 F.Supp. 362, 366 (D.D.C.1989).

▇▇▇ In addition, the FBI impermissibly denied a waiver for copying repetitious, but non-duplicative, material. A scholar has a strong interest in reviewing each repetition of a given topic within a file or set of files to explore nuances and assess the manner in which the government handled the information. Deeming repetitious documents within a single request to be of no value to "public understanding" is therefore inconsistent with the purposes of FOIA.[17] Of course, repetition at some point shades into duplication, but the record on appeal does not explain how the FBI distinguished between permissible and impermissible repetition; we learn only that the Bureau denied a waiver for

---

**16.** A different standard might apply to records or files that are uncommonly large or that contain only a few substantive documents relative to the volume of administrative information.

**17.** The FBI also denied a waiver for copying duplicate documents. This decision appears legitimate, although in certain circumstances the fact that a given document was found in a given file could further public understanding even if the contents of the document are already known.

documents with "substantially the same information" as other documents.

Accordingly, we reverse the grant of summary judgment and remand the case to the district court so that the FBI can conduct an adequate search for ELSUR and tickler records, justify its defenses under exemptions 1, 7(C), and 7(D) in sufficient detail to permit meaningful judicial review, and recalculate its fee waiver ratio to comply with the statutory standards.[18]

18. In light of this disposition, the district court's discussion of attorney's fees is premature; Campbell remains free to request such fees at a later stage in the litigation.