## ACCURACY IN MEDIA, INC., Appellant,

v.

## NATIONAL PARK SERVICE, Appellee.

### No. 98–5535.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 4, 1999.

Decided Oct. 26, 1999.

Larry E. Klayman argued the cause for appellant. Brett M. Wood and Allan J. Favish were on the briefs.

Robert M. Loeb, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Leonard Schaitman, Attorney, and Wilma A. Lewis, U.S. Attorney.

Before: EDWARDS, Chief Judge, WALD and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Accuracy in Media, Inc. ("AIM") applied under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), for photos of the body of the late Deputy White House counsel Vincent W. Foster, Jr., taken at the scene of his death and at the autopsy (as well as other documents about which there is no longer any dispute). The National Park Service, custodian of the documents because the United States Park Police conducted the initial investigation, resisted disclosure, invoking FOIA exemption 7(C), 5 U.S.C. § 552(b)(7)(C), which shelters records compiled for law enforcement purposes if their production would "constitute an unwarranted invasion of personal privacy." The district court granted summary judgment for the Park Service. The first question is whether, when the subject of a document has himself died, the personal privacy protected by 7(C) may include interests of the subject's surviving kin or posthumous privacy interests of the subject himself. If so, then the question arises whether AIM has met the "balancing" test under 7(C) by advancing "compelling evidence" of illegal government activity and of the need for the photos to confirm or refute that evidence. See *SafeCard Services, Inc. v. SEC,* 926 F.2d 1197, 1205–06 (D.C.Cir. 1991). We have already held that the protected privacy interests do extend beyond the interests of a document's subject while alive, see *Campbell v. U.S. Department of Justice,* 164 F.3d 20, 33–34 (D.C.Cir.1998), and we adhere to that view. Further, AIM's evidence does not

satisfy the *SafeCard* standard. Accordingly, we affirm the district court.

* * *

At about six PM on July 20, 1993, a private citizen alerted two off-duty Park Service employees to a dead body in Ft. Marcy Park in suburban Northern Virginia. Their immediate 911 call summoned police and rescue personnel to the scene, where Foster lay dead with a .38 caliber revolver in his right hand and a gunshot wound to his head. The House and Senate launched inquiries into the death. *See* Summary Report by William F. Clinger, Jr., Ranking Republican, Committee on Government Operations, U.S. House of Rep., on the Death of White House Deputy Counsel Vincent W. Foster, Jr. (Aug. 12, 1994); S.Rep. No. 103–433, 103d Cong., 4 (1995). There were also two separate independent counsel inquiries. *See* Report on the Death of Vincent W. Foster, Jr., by the Office of Independent Counsel In re Madison Guaranty Savings and Loan Association (Oct. 10, 1997) ("Starr Report"); Report of the Independent Counsel Robert B. Fiske, Jr., In re Vincent W. Foster, Jr. (June 30, 1994). All of these inquiries concluded that Foster committed suicide. *See* Starr Report at 2, 7–8.

To support its 7(C) privacy claim for the photos, the Park Service presented the declaration of Sheila Foster Anthony, Foster's sister, who described how release of the photos would invade the privacy of the Foster family (including his widow and children) and would cause extreme emotional anguish. It also submitted a so-called *Vaughn* index[1] describing each of the responsive documents found and the basis for withholding or redacting the document.

AIM contested application of the privacy exemption on two grounds. First it argued that because only Foster's privacy was at stake, his death terminated any valid privacy interest. If that were so, the Park Service's exemption claim would automatically fail. In the alternative, AIM argued that it satisfied *SafeCard*'s "compelling evidence" requirement, saying that "there is much controversy about the nature of Mr. Foster's wounds," and that "[t]he photos of Mr. Foster's body are crucial for getting the truth." The district court rejected both theories.

* * *

■ Exemption 7(C) allows non-disclosure of "records or information compiled for law enforcement purposes" when such material "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). AIM rightly points out that in *United States Dep't of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), the Supreme Court recited a number of definitions of privacy under which only the subject could hold the interest. For example, it quoted A. Breckenridge, The Right to Privacy 1 (1970), defining it as "the individual's right to control dissemination of information about *himself.*" 489 U.S. at 764 n. 16, 109 S.Ct. 1468 (emphasis added). In text, in fact, the Court used a possibly broader notion, speaking of information as being private if "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public." *Id.* at 763–64, 109 S.Ct. 1468. For photos of a gunshot victim, the deceased's next of kin might well constitute such a group.

But the primary weakness of AIM's reading of *Reporters Committee* is not so much that some of the quoted definitions are broader than those it has selected, but that the decision's focus was utterly removed from our current problem. At issue were "rap sheets," individualized collections of data on persons' arrests, charges and convictions. The government had theorized that there could be no privacy interest in information that was scattered through public courthouse files and

---

1. See *Vaughn v. Rosen,* 484 F.2d 820, 826–27 (D.C.Cir.1973).

accessible, in theory, to anyone ready to devote enough resources to the task. In advancing the scholarly and dictionary definitions exemplified above, the Court sought only to explain its rejection of this narrow theory of privacy, not to present a hermetically sealed definition of privacy.

Further, our circuit has squarely rejected the proposition that FOIA's protection of personal privacy ends upon the death of the individual depicted. In *Campbell v. United States Dep't of Justice*, 164 F.3d 20 (D.C.Cir.1998), a scholar researching the life of James Baldwin made a FOIA request for Baldwin's "FBI file." The FBI claimed some material was protected from disclosure under exemption 7(C). Campbell challenged this claim, arguing that exemption 7(C) does not "protect the privacy of people who are dead." *Id*. at 33. We responded:

> [D]eath clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living. A court balancing public interests in disclosure against privacy interests must therefore make a reasonable effort to account for the death of a person on whose behalf the FBI invokes exemption 7(C). The court must *also* account for the fact that certain reputation interests and family-related privacy expectations survive death. As was recently pointed out by the Supreme Court in *Swidler & Berlin v. United States*, 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998), the attorney-client privilege survives the death of the client, who "may be concerned about reputation, civil liability, or possible harm to friends or family."

*Id*. at 33–34 (emphasis added) (citations omitted). While we did not resolve "[t]he scope and weight of these interests" because the record in *Campbell* was underdeveloped, see *id*. at 34, the terms of our remand clearly depended on our view that the 7(C) privacy interest survives death of the subject.

The parties struggle over whether language in some of our prior cases, seeming to endorse either a posthumous privacy interest or a privacy interest held by the subject's survivors, is dictum or holding. See *New York Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C.Cir.1990) (en banc); *Badhwar v. United States Department of the Air Force*, 829 F.2d 182, 185–86 (D.C.Cir.1987). We need not pursue that dispute: *Campbell* was an unequivocal holding, and the others at a minimum provide supporting dicta.

It is true that we have not said much by way of explanation. But obviously AIM cannot deny the powerful sense of invasion bound to be aroused in close survivors by wanton publication of gruesome details of death by violence. One has only to think of Lindbergh's rage at the photographer who pried open the coffin of his kidnapped son to photograph the remains and peddle the resulting photos. While law enforcement sometimes necessitates the display of such ghoulish materials, there seems nothing unnatural in saying that the interest asserted against it by spouse, parents and children of the deceased is one of privacy—even though the holders of the interest are distinct from the individual portrayed. We need not here explore whether the interest belongs to living close survivors (in which case it might end at their deaths), or alternatively may inhere posthumously in the subject himself (in which case it would seem to be of indefinite duration), or both.

AIM quite rightly notes that exemption 7(C) protects against unwarranted "invasions" of privacy, not against grief per se. There is no grief exemption. It is the "invasion" that triggers a weighing of the public interest against the private harm inflicted, *NASA*, 920 F.2d at 1005, not the grief or any feeding frenzy of media coverage, even though the latter constitute the private harm. But the release of photos of the decedent at the scene of his death and autopsy qualifies as such an invasion.

\* \* \*

■ To show that the invasion of privacy was not "unwarranted," AIM must show "compelling evidence that the agency denying the FOIA request is engaged in illegal activity, and access to the [photos] is necessary in order to confirm or refute that evidence." *SafeCard*, 926 F.2d at 1205–06. AIM's theory is that known contradictions in the published materials are adequate evidence of government foul play, and that, because those contradictions relate to the nature of the bullet wounds, the photos would likely shed critical light.

Specifically, AIM relies on three statements about Foster's wounds that differ from the conclusion reached by the two congressional inquiries and the two independent counsels, namely, that Foster had an entrance wound in the mouth and an exit wound in the back of the head, which are consistent with suicide. First, a paramedic who was at the scene, reported the wound as an entrance wound at the neck. Second, a Dr. Donald Haut, of the Fairfax County medical examiner's office, examined Foster at Ft. Marcy Park and filed a report that described Foster's wounds on one page as "perforating gunshot wound mouth-head" and on the next as "mouth to neck." Finally, an FBI memo states there was no exit wound at all.

We find AIM's evidence considerably below the threshold. The Starr Report characterizes the exit wound as three inches from the top of the head. Starr Report at 31. Depending on what one views as the "top" of the head, the discrepancy between this and assertions of a neck exit wound may be matters of characterization. Further, the paramedic, after reviewing photos (presumably ones belonging to the disputed set), admitted that he may have been mistaken about Foster having a neck wound. Starr Report at 34 n.77. Dr. Haut's report is internally inconsistent, with one assertion consistent with the later reports from Congress and the two independent counsels. AIM asserts that the consistent entry on Dr.

Haut's report was the product of an alteration. On the photocopy that is part of our record, there does appear to be a deletion on Dr. Haut's typed report just before the word "head," so we cannot rule out AIM's speculation that "neck" had appeared but was deleted. Without more, however, the possibility that "neck" ever appeared in the now-empty space is hardly "compelling evidence" that any government actor has behaved illegally. At least while completing that part of the report, Dr. Haut presumably thought "head" correct. Finally, the FBI memo reporting that there was no exit wound is a puzzling document of unknown origin. But it merely purports to offer "preliminary results" and is date-stamped "July 23, 1993," only three days after Foster died.

When multiple agencies and personnel converge on a complex scene and offer their hurried assessments of details, some variation among all the reports is hardly so shocking as to suggest illegality or deliberate government falsification. Nor does it suggest that the congressional or independent counsel inquiries got anything wrong regarding Foster's wounds. The Starr Report is altogether credible in its assertion that the photos are "[s]ome of the best evidence" of the nature of Foster's wounds, Starr Report at 16, and those who have viewed them have concluded that Foster suffered an entrance wound in the mouth and an exit wound in the back of the head. The likelihood that the photos contradict the statements of all four investigating agencies seems remote. While we agree that falsification by the agencies would show government illegality—under the present facts, indeed, illegality on a massive scale—there is no persuasive evidence of such falsification, much less compelling evidence.

\* \* \*

■ Two final issues: First, AIM contends that the district court should have at least inspected the photos in camera. We review its decision not to do so for abuse of discretion, *Spirko v. United*

*States Postal Serv.,* 147 F.3d 992, 996 (D.C.Cir.1998), and have said that such review "may be particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency." *Quinon v. FBI,* 86 F.3d 1222, 1227–28 (D.C.Cir.1996). None of the evidentiary discrepancies is evidence of bad faith on the part of the Park Service. AIM suggests that the *Vaughn* index falls short in not revealing just how graphic each of the photos is, following up with the suggestion that in camera inspection might identify some photos tame enough to be released with little invasion of personal privacy. Given the subject matter, we cannot imagine any photos that could both elucidate the true nature of Foster's wounds and yet not be disturbingly graphic. We find no abuse of discretion.

■ Second, AIM seeks further discovery on the theory that the Park Service has failed to search adequately for missing photos, handwritten notes, telephone records, and other documents. AIM's claim of need rests on highly speculative criticism of the Park Service's search. For example, it observes that type-written reports from those who attended the autopsy were quite detailed—so detailed, it says, that there must also be some handwritten notes because the attendees could not have typed or dictated the reports from memory. But "[m]ere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search for them." *SafeCard,* 926 F.2d at 1201. We find no abuse of the court's exercise of its discretion to manage the scope of discovery.

\*   \*   \*

The decision of the district court is *Affirmed.*