Allan J. **FAVISH**, Plaintiff–Appellant,

v.

**OFFICE OF INDEPENDENT COUNSEL**, Defendant–Appellee.

No. 98–55594

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1999

Filed July 12, 2000

Allan J. Favish, pro se, Tarzana, California, for the plaintiff-appellant.

Leon W. Weidman, Jan L. Luymes, Assistant United States Attorneys, Santa Ana, California., for the defendant-appellee.

Before: PREGERSON, NOONAN, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge NOONAN; Partial Concurrence and Partial Dissent by Judge PREGERSON

NOONAN, Circuit Judge:

Allan J. Favish appeals the judgment of the district court granting summary judgment to the Office of Independent Counsel (the OIC) in his action under the Freedom of Information Act, 5 U.S.C. § 552 (1999) (the FOIA). Favish seeks 10 photos relating to the death of Vincent W. Foster, Jr., the Deputy Counsel to the President. Holding the OIC has not established that the photos fall within the privacy exemption of the FOIA, we reverse the judgment of the district court and remand for further proceedings.

### FACTS AND PROCEEDINGS

On July 20, 1993, Foster was found dead in Fort Marcy Park. His death was investigated by the National Park Service and the Federal Bureau of Investigation and by a committee of the House and by a committee of the Senate. *See Accuracy in Media v. National Park Service,* 194 F.3d 120 (D.C.Cir.1999). It was also investigated twice by the OIC. These inquiries all concluded that Foster committed suicide.

Favish is a lawyer not convinced by the reasoning of these prior investigators and skeptical of the thoroughness of their investigations. On January 6, 1997, he filed his request under the FOIA seeking from the OIC 150 photocopies of photographs compiled for law enforcement purposes. The photos were identified in the request by reference to *Hearings Related to Madison Guaranty S & L and the Whitewater Corporation—Washington, D.C. Phase* United States Senate, 103d Cong. (1994), with the exception of one photo of a gun in Foster's hand, identified as having been published by *Time,* March 18, 1996 and on ABC–TV. Favish sought higher quality copies of these already-published materials and copies of 9 unpublished photos. He offered to pay for the reproduction. On January 24, 1997, the OIC denied his request, stating that the photos were exempt under 5 U.S.C. § 552(b)(7)(A) (records whose "release could reasonably be expected to interfere with enforcement proceedings") and under § 552(b)(7)(C) (relating to personal privacy). Favish appealed this decision to a higher level of the agency. On February 19, 1997, the OIC denied his appeal, reiterating the exemptions asserted but not explaining how they applied.

On March 6, 1997, Favish filed this suit. On April 28, 1997, the OIC answered making no reference to any exemption and simply denying that Favish was "entitled to the relief sought." On January 5, 1998, the OIC filed a Vaughn index referring to the requested material; at the same time the OIC released 118 copies of the requested photos in black and white. Favish withdrew his request with respect to 21 photos. Eleven photos remained in dispute, as did Favish's request for color versions of the photos released. Both sides moved for summary judgment.

On March 11, 1998 the district court gave summary judgment to Favish as to his request for color photos, to be paid for by Favish, and as to a photo of Foster's eyeglasses. As to the 10 remaining photos, the court balanced the privacy interest of members of the Foster family against the public interest served by new copies of the photos, concluded that the public interest was outweighed by the privacy interest, and gave judgment for the OIC.

Favish appeals.

## ANALYSIS

■ *A Preliminary Question.* Sua sponte, the court asked whether Favish was collaterally estopped by having been associate counsel for Accuracy in Media, the losing plaintiff in *Accuracy in Media, supra.* In response, arguing for estoppel, the OIC cited decisions of this circuit where privacy leading to estoppel has been found when a party to a judgment virtually represented "a person now sought to be estopped." Virtual representation, however, has been based on an express or implied legal relationship that makes the party accountable to the person sought to be estopped. *United States v. Geophysical Corp. of Alaska,* 732 F.2d 693, 697 (9th Cir.1984); *United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir.1980). We have not found a case where a client is accountable to its lawyer. The identity of interest between Favish and Accuracy in Media is "an abstract interest in enforcement" of FOIA, an interest insufficient to create privity. *ITT Rayonier, Inc.,* 627 F.2d at 1003. Collateral estoppel does not apply.

The Command and Purpose of the Statute. The alpha and omega of this case is the statute that prescribes the conditions for the release of records of a public agency when a person makes a request of the agency for a record within its possession. The statute in relevant part reads as follows:

(a) Each agency shall make available to the public information as follows:

. . . . .

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any) and procedures to be followed, shall make the records promptly available to any person.

5 U.S.C. § 552(a)(3)(A).

Three features of the statutory command are of particular note. The duty to make the information available to the public is mandatory ("shall make", repeated). The agency response is to be made to *any* request and to *any* person (emphasis supplied). The agency response is to be made promptly (no need for emphasis on this term aimed at the sluggishness all too characteristic of bureaucracies).

■ The words of a statute are, of course, dead weights unless animated by the purpose of the statute. The purpose of this statute is to shed light "on an agency's performance of its statutory duties." *United States Department of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 772–73, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). The statute is a commitment to "the principle that a democracy cannot function unless the people are permitted to know what their government is up to." *Id.* (internal quotations omitted). The statute's "central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny." *Id.* at 774.

*The Statutory Exemption Invoked.* First, the OIC denied Favish's request on one ground that made no sense, viz, that release of the photos would interfere with law enforcement proceedings. It took over a year for the OIC to abandon this position. The bulk of the photos requested were already in the public domain. How higher quality photos released to Favish would interfere with law enforcement was not and has not been explained by an agency under a statutory duty to

comply promptly with a freedom of information request.

Second, after the OIC did release new copies of the 118 photos it had withheld without adequate explanation, it did not release them in color, nor did it release a new copy of Foster's eyeglasses. The OIC has now released copies in color and a new copy of the eyeglasses photo, thanks to the order of the district court. Not appealing that order, the OIC tacitly admits that it had no legal right to withhold this material.

Third, in its answer to Favish's complaint, the OIC specifically referred to his request for a new copy of the photo published in *Time*, March 18, 1996 and on ABC–TV and stated that the OIC was "without sufficient information or knowledge to form a belief as to the truth of the allegations" that the photo had been published in the forms alleged. This denial was on its face implausible. How could the OIC not discover, with a modicum of diligence, whether a photo published in national news media had not come from its files? But the OIC did not abandon this posture in the ensuing litigation. In its brief on this appeal, the OIC declared that it did not concede that the photo had come from its files and added that Favish's argument "that the photograph already has been widely disseminated" should, therefore, be rejected. Only on appeal in this court, at oral argument, did counsel for the OIC state that it was true that the OIC possessed the photo referred to in Favish's request.

In the proceedings before the district court, although not in its answer, the OIC invoked this exemption:

(b) This section does not apply to matters that are

. . . . .

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy....

5 U.S.C. § 552(b)(7)(C).

■ Here four terms are significant: "production", that is, the release of the records, is what must be expected to have the undesired result; "expected," meaning what may be predicted with probability by a reasonable person, that is, the standard is objective; "unwarranted", that is, unjustified by the purpose of the statute; and "privacy", that is, a right held dear in our democracy. The root meaning of privacy has perhaps been best expressed in the article that launched its legal career. The principle is "that of an inviolate personality." Samuel D. Warren and Louis D. Brandeis, *The Right To Privacy*, 4 Harv. L.Rev. 193, 205 (1890). The statutory term, it is worth adding, is modified by "personal" and is phrased as "privacy", not "privacy interest."

■ The statutory command coupled with the statutory exemption requires "balancing" of the personal privacy expected by a reasonable person to be invaded by the production of the records against the public purpose served by release. *Reporters Committee*, 489 U.S. at 776, 109 S.Ct. 1468. Deference to the determination of the agency that the exemption applies is not due; the burden of the proof that the request may be properly denied because of an exemption rests with the agency. The court "shall determine the matter de novo." § 552(a)(4)(B). The "burden is on the agency to sustain its action." *Id.*

■ *Application of the Statute.* Favish's request focuses on how the OIC conducted its investigation of Foster's death. So doing, his request is in complete conformity with the statutory purpose that the public know what its government is up to. Nothing in the statutory command conditions agency compliance on the requesting party showing that he has knowledge of misfeasance by the agency, although at times evidence of such knowl-

edge has been referred to as enhancing the urgency of the request. *See Hunt v. FBI*, 972 F.2d 286, 289 (9th Cir.1992). Favish, in fact, tenders evidence and argument which, if believed, would justify his doubts; but it is not the function of the court in a FOIA proceeding to weigh such evidence or adjudicate such arguments. *See Washington Post Co. v. U.S. Dep't of Health and Human Services*, 865 F.2d 320, 325 (D.C.Cir.1989).

Nothing in the statutory command shields an agency from disclosing its records because other agencies have engaged in similar investigations. To anyone familiar with famous cases in the Old World or in the New it is a feature of famous cases that they generate controversy, suspicion, and the desire to second guess the authorities. The continuing discussion of the assassination of President Kennedy may suffice to make the point. The statute establishes a right to look, a right to speculate and argue again, a right of public scrutiny that can be denied only if the relevant statutory exemption applies.

The exemption invoked now is the privacy of "the Foster family members." The OIC relies on a declaration made under oath by Sheila Foster Anthony, Foster's sister, that release of the photos "would set off another round of intense scrutiny by the media," leading the family to be "the focus of conceivably unsavory and distasteful media coverage." The family members who would be distressed by this feared coverage are identified by Anthony as Foster's mother, his children, herself, and Foster's widow.

Strictly speaking, it is not "the production" of the records that would cause the harms suggested by the declaration but their exploitation by the media including publication on the Internet. But the statutory reference to what may "reasonably be expected" encompasses the probable consequences of the release. A preliminary question for decision is whether these consequences would invade the personal privacy of persons protected by the exemption. The question is not free from

difficulty due to the imprecision of the statutory phrase.

The statute does not identify whose personal privacy may not be unjustifiably invaded. The statute therefore leaves open the possibility that the exemption does extend to others than the person to whom the information relates, although as a matter of first impression "personal" might seem to refer only to that person. As it happens, the question is not one of first impression in the courts. Release of the photos of the body of the assassinated president has been held to invade the privacy of members of the Kennedy family. *Katz v. National Archives & Records Administration*, 862 F.Supp. 476, 485 (D.D.C. 1994), *aff'd on other grounds*, 68 F.3d 1438 (D.C.Cir.1995). Release of a tape of the last conversation of the astronauts on the Challenger has been blocked because it would invade the privacy of their families. *See New York Times Company v. National Aeronautics and Space Administration*, 920 F.2d 1002, 1009–10 (D.C.Cir.1990) and 782 F.Supp. 628 (D.D.C.1991) (on remand).

It could, no doubt, be suggested that the president or the astronauts so tragically destroyed were special cases, leading to special solicitude for the feelings of their families. That would be a constricted reading of the precedents. What the cases point to is a zone of privacy in which a spouse, a parent, a child, a brother or a sister preserves the memory of the deceased loved one. To violate that memory is to invade the personality of the survivor. The intrusion of the media would constitute invasion of an aspect of human personality essential to being human, the survivor's memory of the beloved dead.

 We hold as a matter of law that the personal privacy in the statutory exemption extends to the memory of the deceased held by those tied closely to the deceased by blood or love and therefore that the expectable invasion of their privacy caused by the release of records made for law enforcement must be balanced against the public purpose to be served by disclosure.

■ Balancing is one of the most pervasive and most elusive metaphors in the law. We do not literally balance, because what is being brought into a comparison has no weight. To many, balancing sounds like assigning hypothetical weights. To others, it may suggest the kind of equilibrium the biological systems of the body achieve. Taken in either sense, balancing seems to require the exercise of discernment in a particular case. Our standard of review of such a question has been carefully set out in *Schiffer v. The FBI*, 78 F.3d 1405 (9th Cir.1996). Where facts are not in dispute, we review de novo as a matter of law the district court's determination of "whether a document fits within one of FOIA's prescribed exemptions." *See id.* at 1409.

■ We do not, however, have before us all the relevant facts. The OIC represents that the 10 withheld photographs are "graphic, explicit, and extremely upsetting." That description is not true of the photo already published in *Time* and on television, showing a hand holding a gun. It may be true of the remaining 9 photos. But no court has ever seen them. The district court has discretion to decide a FOIA case on the basis of affidavits, and affidavits are in some cases sufficient. *Quinon v. F.B.I.*, 86 F.3d 1222, 1229 (D.C.Cir.1996). But when the agency affidavits are insufficiently detailed, *in camera* review is appropriate. *Id.* at 1228. Balancing without a knowledge of what the photos show would be an exercise in the air. Accordingly, we return the case to the district court to examine the photos in camera and to balance the effect of their release on the privacy of the Foster family against the public benefit to be obtained by their release.

*Conclusion.* The judgment of the district court is REVERSED and the case RE-MANDED for proceedings consistent with this opinion.

PREGERSON, Circuit Judge,
concurring in part and dissenting in part:

I agree with the majority that under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)"),[1] Vincent W. Foster Jr.'s surviving family members have a cognizable privacy interest in the ten post-mortem Polaroid photographs of Vincent Foster's face and body that Appellant Allan J. Favish has requested. I also agree that the family's privacy interest in the post-mortem photographs taken at the scene of Foster's death by a self-inflicted gunshot wound must be balanced against the public's interest in disclosure. I disagree, however, that remand for an in camera inspection of the photographs is necessary before these interests can be properly balanced. I believe the affidavit and exhibits contained in the "Vaughn index"[2] submitted by the Office of Independent Counsel ("OIC") are sufficiently detailed to justify withholding these photographs under Exemption 7(C). I also believe that the district court properly balanced the family's privacy interest against the public's interest in the production of the photographs and concluded that their disclosure " 'could reasonably be expected to constitute an unwarranted invasion of [the family's] personal privacy.' " *See Hunt v. FBI*, 972 F.2d 286, 287–89 (9th Cir.1992) (quoting 5 U.S.C. § 552(b)(7)(C)). On this basis, I would hold that the nine, never-before-released post-mortem Polaroid photographs of Foster's face and body are exempt from disclosure under Exemption 7(C). I would, however, order the release of the photograph of Foster's right hand clutching the gun, which previously appeared in Time Magazine and other media.

---

**1.** Exemption 7(C) exempts production of "records or information compiled for law enforcement purposes ... to the extent that production ... could reasonably be expected to constitute an unwarranted invasion of personal privacy...." 5 U.S.C. § 552(b)(7)(C).

**2.** The Vaughn index derives its name from the case of *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973)

## I. The Vaughn Index

### A. General Principles

In a FOIA case, the government agency seeking to withhold requested documents has the burden of proving the applicability of any FOIA exemption claimed, *see Minier v. CIA*, 88 F.3d 796, 800 (9th Cir.1996), and "the district courts are to review de novo all exemption claims advanced" by the government, *King v. United States Dep't of Justice*, 830 F.2d 210, 217 (D.C.Cir.1987). Because the agency has sole access to the withheld documents, the ordinary rules of discovery do not operate in a FOIA case to "give each party access to the evidence upon which the court will rely in resolving the dispute between them." *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir.1991). " 'This lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system[ ].' " *Id.* (quoting *Vaughn*, 484 F.2d at 824) (alteration in original). To correct this imbalance, the courts devised the Vaughn index requirement, which may be imposed on government agencies seeking to withhold documents requested under FOIA. *See id.; see also Fiduccia v. United States Dep't of Justice*, 185 F.3d 1035, 1042 (9th Cir.1999) (noting that "[t]here is no statutory requirement of a Vaughn index or affidavit.").[3]

"The purpose of the Vaughn index is to 'afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholdings.' " *Citizens Comm'n on Human Rights v. FDA*, 45 F.3d 1325, 1328 (9th Cir.1995) (quoting *Wiener*, 943 F.2d at 977). The Vaughn "index functions to restore the adversary process to some extent, and to permit more effective judicial review of the agency's decision." *Wiener*, 943 F.2d at 977–78. "Consistent with its purpose, a Vaughn index is not required where it is not needed to restore the traditional adversary process." *Wiener*, 943 F.2d at 978 n. 5. For example, a Vaughn index is unnecessary where "the FOIA requester ha[s] acquired sufficient facts to permit the adversary process to function." *Id.* (citing *Brown v. FBI*, 658 F.2d 71, 74 (2d Cir. 1981)). "[W]hen a FOIA requester has sufficient information to present a full legal argument, there is no need for a Vaughn index." *Minier*, 88 F.3d at 804.

To fulfill its purpose, a Vaughn index must "identify[ ] each document withheld, the statutory exemption claimed, and [provide] a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption." *Id.* at 977. The Vaughn index may consist of detailed affidavits or other evidence "showing that the information logically falls within the claimed exemptions." *Minier*, 88 F.3d at 800 (citation omitted). Such affidavits may not be "vague" or merely "conclusory," *King*, 830 F.2d at 219, but should disclose "as much information as possible without thwarting the [claimed] exemption's purpose," *Wiener*, 943 F.2d at 978 (citation omitted) (alteration in original).

### B. The Sufficiency of the OIC's Vaughn Index

The majority opinion states that the OIC's Vaughn index is insufficiently detailed with respect to the ten post-mortem Polaroids at issue on appeal[4] because the

---

3. In fact, "Congress did not speak of an "index" [in FOIA]. The statute says that an agency has [only] to 'notify the person making such request of [the] determination [to withhold the documents sought] and the reasons therefor.' " *Fiduccia*, 185 F.3d at 1042 & n. 9 (quoting 5 U.S.C. § 552(a)(6)(A)(i)).

4. The OIC's Vaughn index actually consisted of an affidavit and exhibits numbering over 200 pages that addressed Favish's FOIA request in its entirety. Favish's FOIA request ultimately embraced over a hundred photographs, including 129 photographs and written information appearing in 32 photographs (on front or back). The index provided: (1) photocopies of the fronts and backs of all photographs that had been previously released by the OIC to the United States Senate; (2) a photocopy of the FBI Receipt describing the photographs that had not been previously released at all; (3) a description of the OIC's

OIC described these photographs as "graphic, explicit, and extremely upsetting," including the photograph depicting Vincent Foster's hand clutching the gun. Majority Op. at 1174. According to the majority opinion, because the latter photograph is not "graphic" and no court has ever seen the nine other photographs, "[b]alancing [the public's interest in their disclosure against the personal privacy interest in nondisclosure] without a knowledge of what the photos show would be an exercise in the air." *Id.* On this basis, the majority concludes that remand for an in camera inspection of the photographs is necessary. I disagree.

The fact that no court has seen these photographs is not dispositive on the question whether in camera review is required. If that were the litmus test for when in camera review should be undertaken, in camera review would be required in almost every FOIA case. That is not what FOIA requires. Under FOIA, "the decision to conduct an in camera review is committed to the broad discretion of the trial court judge." *Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C.Cir.1996) (citations omitted); *see also* 5 U.S.C. § 552(a)(4)(B) (Supp.1999). "The in camera review provision ... is designed to be invoked when the issue before the District Court *could not otherwise be resolved;* it ... does not mandate that the documents be individually examined in every case." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (emphasis added). Thus, "an in camera review should *not* be resorted to as a matter of course, simply on the theory that 'it can't

hurt.'" *Quinon,* 86 F.3d at 1228 (emphasis added).

I believe that the OIC's Vaughn index's description of the ten post-mortem Polaroid photographs is sufficiently detailed for the district court to resolve the issues in this case. Indeed, it is unclear exactly what an in camera review would add to the district court's already thoughtful and thorough analysis of the issues here.

The OIC's Vaughn index did not just describe the photographs as "graphic" as the majority opinion suggests. The index contained a general narrative description of the nine post-mortem photographs, which stated:

> The material withheld is a photograph of Mr. Foster's body in Fort Marcy Park. Disclosure of this photograph would cause Mr. Foster's surviving family members a great deal of anguish and reasonably can be expected to constitute an unwarranted invasion of their personal privacy. The disclosure of this graphic picture would shed no light on how the government performs it[s] statutory duties. The material therefore is exempt from disclosure under FOIA Exemption (b)(7)(C).

The OIC's Vaughn index also included a photocopy of the FBI "Receipt for Property Received/Returned/Released/Seized" ("the FBI Receipt") that set forth a handwritten description of the ten post-mortem Polaroid photographs and eight other photographs [5] that were taken by the National Park Service at the scene of Vincent Foster's death in Fort Marcy Park. The FBI

---

system for searching for the requested photographs and detailed explanation of the form used for identifying and justifying any redacted information or photographs withheld in their entirety; (4) the pre-litigation correspondence between the parties; and (5) narrative descriptions of the requested photographs and written information appearing on them that generally identified the photographs or portions thereof being withheld by the OIC, the exemption claimed, and the justification for withholding the exemption, including the interests to be harmed from the disclosure of the information.

**5.** The other eight Polaroids listed on the FBI Receipt on page 2112 are not at issue on appeal because copies of seven of them were released to Favish pursuant to stipulation lodged in district court on February 9, 1998, and the district court ordered the release of a copy of the eighth photograph, depicting Vincent Foster's eyeglasses lying on the ground at Fort Marcy Park. The eight Polaroids released pursuant to stipulation depict the location and environs where Vincent Foster was found dead and the interior of the car he purportedly drove to Fort Marcy Park.

Receipt uses Vincent Foster's initials, "VF," and describes the ten post-mortem Polaroids as follows:

VF's body—looking down from top of berm

. . . VF's body—focusing on face

. . . VF's body—focusing on rt. side shoulder/arm

\* \* \* \* \* \*

. . . right hand showing gun & thumb in guard

\* \* \* \* \* \*

. . . VF's body taken from below feet

. . . VF's body focusing on right side & arm

. . . VF's body focus on top of head thru heavy foliage

. . . VF's body focus on head & upper torso

. . . VF's face—looking directly down into face

. . . VF's face—Taken from right side focusing on face & blood on shoulder. . . .

No one disputes that Vincent Foster died when a .38 caliber revolver was placed in his mouth and the trigger was pulled. It is therefore difficult to understand just how much more detail the OIC would have had to provide to satisfy the majority. Certainly, what the OIC did provide was "as much information as possible without thwarting the purpose of the exemption claimed." *Wiener,* 943 F.2d at 979.

More importantly, Favish does not argue with the OIC's description of what the photographs depict (e.g., the head, face, or body of Vincent Foster). Nor does he suggest that the OIC's description of these photographs was provided in bad faith. His argument is with how the OIC interpreted the photographs and the conclusions the OIC drew from them. In particular, Favish disputes the OIC's conclusion that the photographs establish that Foster committed suicide. Generally speaking, in camera inspection would be appropriate where a FOIA request specifies only the *kind* of information sought and the Vaughn index provides insufficient detail

for the district court to determine whether the withheld documents qualify for the claimed exemption. *See Wiener,* 943 F.2d at 978–79. But where, as here, the Vaughn index provides (1) sufficient detail to permit meaningful review of the exemptions claimed, (2) there is no evidence of bad faith on the part of the governmental agency, and (3) "the dispute turns on the . . . parties' interpretations of [the withheld] documents," not their contents, in camera review may not be necessary. *Quinon,* 86 F.3d at 1228. Given such circumstances, I cannot agree with the majority opinion's conclusion that the district court abused its discretion in declining to conduct an in camera review in this case.

Finally, the record and discussion *infra* clearly establish that Favish had "sufficient information [about the post-mortem photographs] to present a full legal argument" in this case and in another FOIA case presented to the Court of Appeal for the District of Columbia. *See Accuracy in Media, Inc. ("AIM") v. National Park Service,* 194 F.3d 120 (D.C.Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1966, 146 L.Ed.2d 797 (2000). AIM's FOIA case sought black and white copies of precisely the same photographs that Favish seeks color copies of here. As AIM's co-counsel, Favish wrote the reply brief considered in AIM's appeal to the D.C. Circuit. That reply brief is in large measure identical to the appellate brief filed in his appeal to this court. The D.C. Circuit held the photographs exempt under Exemption 7(C). *See id.* at 123–25. In so ruling, the court rejected the same claim about the Vaughn index that Favish makes in this case, viz: "that the Vaughn index falls short in not revealing just how graphic each of the photos is." *Id.* at 125. As the D.C. Circuit stated: "Given the subject matter, we cannot imagine any photos that could both elucidate the true nature of Foster's wounds and yet not be disturbingly graphic." *Id.* I agree.

## II. Exemption Under 7(C)

### A. General Principles

Having determined that in camera review is unnecessary because the factual basis for the district court's decision is sufficient, the next issue is whether the OIC properly withheld the post-mortem Polaroid photographs under Exemption 7(C). Although FOIA's exemptions " 'must be narrowly construed,' . . . the[se] . . . exemptions are intended to have meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989) (quoting *Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)). Congress enacted Exemption 7(C) and the other FOIA exemptions because it " 'realized that legitimate . . . private interests could be harmed by release of certain types of information.' " *Id.* at 152, 110 S.Ct. 471 (quoting *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982)). Thus, Exemption 7(C) permits the government to withhold documents "compiled for law enforcement purposes, but only to the extent that [the government establishes that] the production of such records could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . ." 5 U.S.C. § 552(b)(7)(C); *see also Schiffer v. FBI*, 78 F.3d 1405, 1409–10 (9th Cir.1996). To meet its burden, the government need show "only that an unwarranted invasion of privacy could be reasonably expected, not that it will inevitably occur." *Hunt*, 972 F.2d at 288.

In determining whether the government has met its burden of proof, "a court weighs 'the public interest in disclosure against the possible invasion of privacy caused by the disclosure.' " *Id.* at 1409 (quoting *Hunt*, 972 F.2d at 287). The "sole cognizable public interest for FOIA is the interest 'to open agency action to the light of public scrutiny,' to inform the citizenry 'about what their government is up to.' " *Rosenfeld v. United States Dep't of Justice*, 57 F.3d 803, 811 (9th Cir.1995) (quoting *Department of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 772–73, 109 S.Ct. 1468, 103 L.Ed.2d 774(1989)). The " 'identity of the requesting party' . . . [thus has] 'no bearing on the merits of his [ ] FOIA request.' " *Schiffer*, 78 F.3d at 1411 (quoting *Reporters Comm.*, 489 U.S. at 771, 109 S.Ct. 1468) (second alteration in original).[6] Rather, "[w]hether disclosure of a document under Exemption 7(C) is warranted must turn on the *nature of the requested document and its relationship to [this] 'basic purpose . . . .' " *Reporters Comm.*, 489 U.S. at 772, 109 S.Ct. 1468 (internal citation omitted) (emphasis added).

To determine whether the government met its burden of proof concerning the applicability of Exemption 7(C) to the withheld Polaroid photographs, an understanding of the government's actions concerning Vincent Foster's death is necessary. *See Wiener*, 943 F.2d at 985 ("[T]he public interest in disclosure, and the proper balancing of the two, will vary depending upon the content of the information and the nature of the attending circumstances."). This factual perspective is essential to the determination whether production of the photographs will shed any light on "what their government is up to." *Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468.[7]

### B. Factual Background

#### 1. Vincent Foster's Death and the Multiple Investigations That Ensued

In late afternoon on July 20, 1993, Deputy White House Counsel Vincent W. Foster Jr. was found dead by a private citizen

---

6. The majority thus mistakenly ascribes undue importance to the fact that Favish is a "skeptical" "lawyer" who personally disagrees with the government's interpretation of the post-mortem photographs.

7. Here, the fact that the Polaroid photographs were "compiled for law enforcement purposes" is not disputed.

in Fort Marcy Park, a national park located in a Northern Virginia suburb of Washington, D.C. According to eyewitness accounts and the investigative reports of the FBI and U.S. Park Service published by a Senate committee on July 29, 1994, *see Hearings Relating to Madison Guaranty S & L and the Whitewater Development Corporation—Washington, D.C. Phase,* volume II, 103rd Cong. (2nd sess.1994) ("Senate Hearings Volume II"), a 911 call summoned the United States Park Police to a sloping embankment where a body—later identified as Vincent Foster—lay dead. Park Police found Foster's body facing up, with his head positioned slightly below the top of a berm and his body sloping down the embankment, enveloped in foliage; his extremities were apparently not clearly visible to witnesses who stood on the top of the berm. Park Police investigators took Polaroid and 35mm photographs of the death-scene, surrounding environs, and Mr. Foster's face and body—including the ten Polaroids at issue in this appeal. As they did so, they observed a .38 caliber revolver in Mr. Foster's right hand (his thumb still in the trigger guard), gunpowder residue or burns on his right hand web and forefinger, and a gunshot wound to his head. Blood was visible in his nose and mouth area, on his right shoulder area, and in a pool underneath his head. There was no sign of a struggle, no other signs of trauma to the body, and no indication that the foliage or vegetation around his body had been trampled by others.

Five government inquiries investigated the circumstances and cause of Vincent Foster's death. Because Fort Marcy Park is a national park, the U.S. Park Police, a component of the U.S. Park Service, had primary jurisdiction over the first investigation into Mr. Foster's death. After his death, a handwritten note was found torn in pieces at the bottom of Mr. Foster's briefcase in his White House office. The FBI had jurisdiction over the investigation into the circumstances surrounding the discovery of the note. On August 10, 1993, both the Park Police and the FBI an-

nounced their findings. The Park Police concluded that Mr. Foster committed suicide, and the FBI found no criminality in connection with the note's discovery.

A flurry of media exposes followed both announcements. Faced with mounting speculation about the circumstances of Vincent Foster's death and the Park Police's investigation into it, Attorney General Janet Reno appointed Robert B. Fiske, Jr. as a regulatory Independent Counsel, pursuant to 20 C.F.R. §§ 600 and 603.1, in part to investigate the circumstances surrounding Vincent Foster's death and the events that occurred in the White House following his death. On June 30, 1994, Mr. Fiske issued a 58–page public report on the death of Vincent Foster that reached the same conclusion as the Park Police: the "overwhelming weight of the evidence compels the conclusion ... that Vincent Foster committed suicide ..." by a self-inflicted gunshot wound. *Report of the Independent Counsel Robert B. Fiske, Jr., In re Vincent W. Foster, Jr.* (June 30, 1994).

Meanwhile, the House and Senate launched additional inquiries into the circumstances of Vincent Foster's death. Congressman William F. Clinger, Jr., the ranking Republican on the House Committee on Government Operations, instructed the Committee's staff to "thoroughly review ... the investigation into the death of White House aide Vincent W. Foster to determine if there had been any improper manipulation of the investigation by the White House or others." 140 Cong. Rec. H2177–05 (daily ed. Apr. 12, 1994) (statement of Rep. Clinger). And the Senate Committee on Banking, Housing, and Urban Affairs conducted public hearings to "investigat[e] ... and study" the Whitewater matter and "all matters that have a tendency to reveal the full facts about:.... (B) the Park Service Police investigation into the death of White House Deputy Counsel Vincent Foster; and (C) the way in which White House officials handled documents in the office of White House

Deputy Counsel Vincent Foster at the time of his death; and ... make such findings of fact as are warranted and appropriate...." S. Res. 229, 103d Cong., 2d Sess. (1994), 140 Cong. Rec. S7076–01 (June 16, 1994). Both inquiries categorically concluded that Mr. Foster committed suicide. *See Summary Report by William F. Clinger, Jr., Ranking Republican, Committee on Government Operations, U.S. House of Representatives, On the Death of White House deputy Counsel Vincent W. Foster, Jr.* (Aug. 12, 1994) ("all available facts lead to the undeniable conclusion that Vincent W. Foster, Jr. took his own life in Fort Marcy Park, Virginia on July 20, 1993."); S.Rep. No. 103–433, 103d Cong., 4 (1995) ("[t]he evidence overwhelmingly supports the conclusion of the Park Police that on July 20, 1993, Mr. Foster died in Fort Marcy Park from a self-inflicted gunshot wound.").

Nevertheless, a fifth inquiry was undertaken by the Office of Independent Counsel pursuant to the Ethics in Government Act of 1978, 28 U.S.C. §§ 591–599, as reauthorized by the Independent Counsel Reauthorization Act of 1994, Pub.L. No. 103–270, 108 Stat. 732. On August 5, 1994, Kenneth W. Starr was appointed statutory Independent Counsel by the Special Division of the United States Court of Appeals for the District of Columbia Circuit ("the Special Division"). Mr. Starr was authorized to conduct an extensive investigation into the circumstances of Mr. Foster's death, the handling of documents in Mr. Foster's White House office following his death, and other matters. *See Report on the Death of Vincent W. Foster Jr., By the Office of Independent Counsel, In re: Madison Guaranty Savings & Loan Ass'n, to the Special Division of the United States Court of Appeals for the District of Columbia Circuit* (filed July 15, 1997) (leave to publish granted by the Special Division on Oct. 10, 1997, pursuant to 28 U.S.C. § 594) ("Starr Report"). To conduct the investigation, Mr. Starr assembled a team of experienced investigators and renowned forensic experts.[8] *See id.*

After a three-year investigation involving interviews with more than thirty witnesses and analysis of hundreds of documents, forensic reports, the physical evidence, and death-scene and autopsy photographs, Mr. Starr reached the same conclusion about Vincent Foster's death that the Park Police, Independent Counsel Fiske, and the House and Senate Committees had reached: "The available evidence points clearly to suicide as the manner of death." [9] *Id.*

In sum, as the district court observed in this case, Vincent Foster's death has been the subject of intense scrutiny by the national media and "exhaustive[ly] investigat[ed]" in the course of five government inquiries. The unanimous, yet independent, conclusion of all inquiries is that Mr. Foster died from a self-inflicted gunshot

---

8. "The investigators included an FBI agent detailed from the FBI–MPD Cold Case Homicide Squad in Washington, D.C.; an investigator who also had extensive homicide experience as a detective with the Metropolitan Police Department in Washington, D.C. for over 20 years; and two other OIC investigators who had experience as FBI agents investigating the murders of federal officials and other homicides." *Id.* at 111. The forensic experts included Dr. Henry C. Lee, Ph.D., an expert in physical evidence and crime scene reconstruction who is Director of the Connecticut State Police Forensic Science Laboratory; Dr. Brian D. Blackbourne, M.D., a forensic pathologist who is Medical Examiner for San Diego County; and Dr. Alan L. Berman, Ph.D, an expert suicidologist who cur-

rently is Executive Director of the American Association of Suicidology. *See id.* at 2.

9. Mr. Starr's conclusion reflected that of Dr. Lee ("[a]fter careful review of the crime scene photographs, reports, and reexamination of the physical evidence, the data indicate that the death of Mr.Vincent W. Foster, Jr. is consistent with a suicide...."), Dr. Blackbourne ("Vincent Foster committed suicide on July 20, 1993 in Ft. Marcy Park by placing a .38 caliber revolver in his mouth and pulling the trigger. His death was at his own hand."), and Dr. Berman ("In my opinion and to a 100% degree of medical certainty the death of Vincent Foster was suicide. No plausible evidence has been presented to support any other conclusion.").

wound on July 23, 1993 in Fort Marcy Park, Virginia.

## 2. Favish's FOIA Request and Complaint

On January 6, 1997—seven months before Mr. Starr filed his final report on the death of Vincent Foster with the Special Division of the District of Columbia Circuit and ten months before the OIC received the court's approval to publicly release that report [10]—Favish sent a letter to the OIC requesting the release under FOIA of the "highest quality duplicate photographic [color] prints" of "photographs taken in connection with the investigation into the death of Vincent Foster." Favish specifically requested ten categories of photographs. The photographs requested in eight of the categories were identified by the page in Senate Hearings Report Volume II on which the Senate Committee on Banking, Housing, and Urban Affairs had previously published copies. But, because the photograph of Mr. Foster's right hand clutching the gun and the nine post-mortem Polaroid photographs of Mr. Foster's face and body had not been published in

the Senate Hearings Report Volume II,[11] Favish requested these photographs in two separate categories. One category requested the photograph of "Mr. Foster's hand with a gun still in it" that purportedly was broadcast by ABC–TV News in March 1994, reprinted in Time Magazine on March 18, 1996, and appears to have been "listed on page 2112" of the Senate Hearings Report Volume II. In the second category, Favish simply requested those Polaroid photographs "listed on page 2112" of the Senate Hearings Report Volume II. Page 2112 consists of a photocopy of the FBI Receipt discussed *supra*, which bears the handwritten description of the eighteen photographs taken by the National Park Service in Fort Marcy Park within hours of Vincent Foster's death.

By letter dated January 24, 1997, the OIC denied Favish's request in its entirety, citing Exemptions 7(A), 5 U.S.C. § 552(b)(7)(A), which exempts from disclosure information that may reasonably interfere with an ongoing law enforcement investigation or proceeding, and Exemption 7(C). Favish administratively appeal-

10. The Independent Counsel Reauthorization Act ("the Act") requires an independent counsel "to file a final report with the [Special] division of the [D.C. Circuit] court, setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought." 28 U.S.C. § 592(h)(1)(B). Until that report is filed and the D.C. Circuit approves it, an OIC's investigation is considered ongoing. While an investigation is ongoing, the Act mandates that the OIC "exercise restraint" in releasing information that prosecutors "do not normally provide the public," *Conference Report on S. 24, Independent Counsel Reauthorization Act of 1994*, H.R. 103–511, 140 Cong. Rec. H36907–02, at *H3702 (2d Sess. 1994), which would include death-scene Polaroid photographs. Congress instructed the OIC to exercise particular restraint where, as in the case of Vincent Foster's death, it decides not to prosecute anyone. *See id.*

11. Since the U.S. Park Police turned the post-mortem photographs over to the OIC in 1994, the OIC has maintained that the privacy interests of Mr. Foster's surviving family members in these gruesome death-scene photographs

outweigh the public interest in disclosure. For this reason, the OIC has refused to publish them in any form—including the OIC's report to Congress dated June 30, 1994 (prepared by Independent Counsel Robert B. Fiske, Jr.) and its court-approved summary report dated October 10, 1997 (prepared by Independent Counsel Kenneth W. Starr). *See* Senate Hearings Volume II; Starr Report.

The OIC stated in the Starr Report that "based on traditional privacy considerations, this report does not include death scene or autopsy photographs. The potential for misuse and exploitation of such photographs is both substantial and obvious." *See Starr Report* at 16–17 (citing by way of comparison, *e.g., Navy Report Omits Suicide Notes*, N.Y. Times, Nov. 2, 1996, at 9 (regarding suicide of Admiral Boorda: "The Navy Department decided not to make the notes public.... Many other items in the report are blacked out, like the autopsy report and the identities of people interviewed by investigators."); *Katz v. National Archives and Records Admin.*, 68 F.3d 1438, 1441 (D.C.Cir.1995) ("Out of concern for the Kennedy family's privacy, ... the x-rays and photographs did not become a part of the record of the Warren Commission.")).

ed on January 28, 1997. The appeal was denied by the OIC on February 19, 1997.

On March 6, 1997, Favish filed a complaint for injunctive relief in district court for the Central District of California. The complaint sought release of all photographs and information embraced by Favish's FOIA request.

After the Special Division granted the OIC leave to publicly release the Starr Report on October 10, 1997, the OIC reviewed the photographs and the information written on them that Favish sought by his FOIA request. The Special Division's approval of the Starr Report's public release marked the official conclusion of Mr. Starr's OIC investigation into Vincent Foster's death. Thereafter, the OIC withdrew its objection to production of the photographs requested on the basis of FOIA Exemption (b)(7)(A).

On January 5, 1998, the OIC filed a *Vaughn* index and released black and white copies of 118 photographs in full (front and back) and fourteen photographs in part (front or back) that it had previously withheld. Copies of all of the released photographs were published in Senate Hearings Report Volume II.

On February 12, 1998, the district court entered the parties' "Stipulation to Dismiss With Prejudice Claims to Information Withheld Pursuant to Exemption (b)(3) and Claims as to Certain Information Withheld Pursuant to (b)(7)(C) and Identification of What Remains At Issue." Pursuant to that stipulation, the only photographs that remained in dispute were eleven post-mortem photographs taken in Fort Marcy Park: one depicting Mr. Foster's right-hand holding the gun, one depicting only Mr. Foster's eyeglasses lying on the ground in Fort Marcy Park, and nine post-mortem photographs of Mr. Foster's body and face. Exemption 7(C) was the only exemption claimed. And the parties stipulated that "[t]he *only* issue left to be resolved with regard to this exemption is whether the disclosure of these photographs could reasonably be expected to

constitute an unwarranted invasion of personal privacy." (Emphasis added.)

On February 11 and 13, 1998, the parties filed cross-motions for summary judgment. In support of its summary judgment motion and to establish the significant privacy interest at stake, the OIC filed the declaration of Sheila Foster Anthony, Mr. Foster's surviving sister. Writing on behalf of Vincent Foster's widow, three children, elderly mother, and other family members, Ms. Anthony expressed the

fervent[ ] belie[f] that releasing any photocopies depicting Vince's body postmortem would constitute a painful warranted invasion of my privacy, my mother's privacy, and the privacy of Lisa Moody (widow of Vincent Foster), her three children and other members of the Foster family.

. Our family has suffered a great loss under extremely tragic circumstances, compounded by the barrage of newspaper and magazine articles and television reports that followed Vince's death. An intensely emotional and private matter drew national attention, and reporters, as well as simply curious individuals, harassed my grieving family in unbelievably insensitive ways. They do to this day. It is my ardent desire to protect my family as well as myself from additional torment which would result from the release of these graphic photographs.

I fear that the release of these photographs certainly would set off another round of intense scrutiny by the media. Undoubtedly, the photographs would be placed on the Internet for world consumption. Once again my family would be the focus of conceivably unsavory and distasteful media coverage. I cannot adequately express how truly unjust, unfair and cruel it would be to subject my family to more public scrutiny and the dissemination of these photographs via the Internet or by other print and electronic means. No member of any family

should ever be concerned with the possible public exposure of photographs of this nature.

The death of my brother has been more than adequately investigated. Five separate government inquiries have determined that Vince's death was a result of a self-inflicted gun wound. Therefore, I cannot fathom a legitimate or rational reason why the photographs should be released. The mere suggestion that these photographs would be released is unconscionable. The release of these photographs would only bring more agony to members of my family.

We have endured enough pain and personal invasion by the media and by those who investigated the death of my brother. While I have tried here, I cannot adequately express the anguish release of these photographs would bring to me and the entire Foster family.

The Court has been asked by the Government to uphold its position that the release of the photographs would be an unwarranted invasion of my personal privacy and that of Vince's family. I implore the Court to do all it can to protect Vince's family, but particularly his children, and his 83 year old mother, from further invasion and the distressing events that surely would result from the release of the photographs.

After hearing oral argument and reviewing the evidence, the district court granted partial summary judgment for Favish and ordered the OIC to produce the Polaroid photograph of Mr. Foster's eyeglasses lying on the ground at Fort Marcy Park and to produce color copies, at Favish's expense, of any photograph released in response his FOIA request if it was originally taken in color. The court, however, ruled that the privacy interests of Mr. Foster's surviving family members outweighed the public interest in disclosure of the nine post-mortem Polaroid photographs of Vincent Foster taken in Fort Marcy Park under Exemption 7(C) and granted the OIC partial summary judgment on this basis. Favish timely appeals.

## C. Balancing the Personal Privacy Interest at Stake Against the Public's Interest in Disclosure

### 1. The Privacy Interest

Favish concedes that release of the nine post-mortem Polaroids of Vincent Foster's face and body are likely to cause to Foster's surviving family members pain and anguish. Favish argues, however, that "family grief" or "emotional grief" is not a legally cognizable privacy interest under FOIA—an argument that the majority and I reject. As noted *supra*, the Court of Appeals for the District of Columbia in *AIM* was confronted with essentially the same FOIA request as that at issue here. As the *AIM* court stated:

> [one] cannot deny the powerful sense of invasion bound to be aroused in close survivors by wanton publication of gruesome details of death by violence. One has only to think of Lindbergh's rage at the photographer who pried open the coffin of his kidnapped son to photograph the remains and peddle the resulting photos. While law enforcement sometimes necessitates the display of such ghoulish materials, there seems nothing unnatural in saying that the interest asserted against it by spouse, parents and children of the deceased is one of privacy—even though the holders of the interest are distinct from the individual portrayed.

*Id.* at 123.

In the present case, the majority and I agree that, as a matter of law, FOIA protects the privacy interests that Vincent Foster's surviving family members have in the post-mortem photographs of the deceased and the intimate details of the circumstances surrounding his death that they reveal. *Cf. Bowen v. FDA*, 925 F.2d 1225, 1228 (9th Cir.1991) (holding that the privacy interest of a deceased's family in the deceased's autopsy report is protected by FOIA's Exemption (b)(6)); *cf. also Hale v. United States Department of Justice*, 973 F.2d 894, 902 (10th Cir.1992) (finding that Exemption 7(C) exempts pho-

tographs of a deceased murder victim from disclosure because no discernible public interest outweighed "the personal privacy interests of the victim's family"), *vacated on other grounds,* 509 U.S. 918, 113 S.Ct. 3029, 125 L.Ed.2d 717 (1993), *implicitly reinstated on remand,* 2 F.3d 1055, 1057–58 (10th Cir.); *New York Times Co. v. NASA,* 782 F.Supp. 628 (D.D.C.Cir.1991) (finding that the Challenger astronauts' surviving families have "valid and substantial" privacy interests in the voice communications of the astronauts tape recorded aboard the space shuttle immediately prior to its explosion); *Katz v. National Archives & Records Admin.,* 862 F.Supp. 476, 482 (D.D.C.1994) (accepting as undisputed that the Kennedy family has a privacy interest in the autopsy records of President Kennedy).

The survivors' privacy interests also involve their "right to avoid[ ] disclosure of personal matters" or at least "to control the dissemination" of such information. *Reporters Comm.,* 489 U.S. at 762, 762–64 & n. 16, 109 S.Ct. 1468. Favish argues that such privacy interests have been diminished in this case because the circumstances of Vincent Foster's death are publicly known. He is mistaken. "The Supreme Court explicitly rejected [a similar] argument in *Reporters Committee,* stating that ... the fact that 'an event is not wholly "private" does not mean that an individual has no interest in limiting disclosure or dissemination of the information.' " *Schiffer,* 78 F.3d at 1410–11 (quoting *Reporters Comm.,* 489 U.S. at 770–71, 109 S.Ct. 1468; *see also FLRA,* 510 U.S. at 499, 114 S.Ct. 1006) ("An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information be available to the public in some form.").

Here, there is simply no question that the release of these photographs "could reasonably be expected to constitute an unwarranted invasion" of the Foster family's personal privacy. Doing so will deprive the family of their right to "avoid" the dissemination of these highly personal photographs and to keep the "personal

facts [they depict] away from the public eye." *Reporters Comm.,* 489 U.S. at 769–70, 109 S.Ct. 1468 (citing *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). And that constitutes a cognizable and significant invasion of their privacy under FOIA. Unless these photographs will "shed light on what the government is up to," and thus serve the sole public interest cognizable under FOIA, they should not be ordered released. *Reporters Comm.,* 489 U.S. at 773, 109 S.Ct. 1468.

### 2. The Public's Interest in Disclosure

The governmental agency in question here is the OIC. The conduct in question is the OIC's two investigations into the circumstances of Vincent Foster's death and their conclusion that he committed suicide. As the district court stated, the public has a substantial interest in ensuring that the "OIC conducted a proper and thorough investigation."

But Favish has made no showing that anyone connected with the OIC's investigations—including Mr. Starr—engaged in wrongful conduct, failed in his or her official duties, or that the nine post-mortem photographs at issue will shed any light on the integrity of their investigations, the nature of the OIC's conduct, or the correctness of its conclusions. Although the government bears the burden of establishing that the photographs are exempt from disclosure under FOIA, *Schiffer,* 78 F.3d at 1409–10 (citing 5 U.S.C. § 552(a)(4)(B)), "the person requesting the information must identify with reasonable specificity, how disclosure would advance the public interest," *Hale,* 973 F.2d at 900. Favish has failed to do so in this case with respect to the nine post-mortem Polaroid photographs of Foster's face and body.

Favish's overarching argument is that the photographs are needed because the OIC's investigation was "grossly incomplete and untrustworthy." Such "generic platitudes clearly are not enough" to tilt the balance in favor of disclosure. *Id.* As the Seventh Circuit observed, the contention that private information is needed "to serve as a watchdog over the adequacy

and completeness of an FBI investigation ... would apparently apply to every ... criminal investigation, severely vitiating the privacy ... provision[ ] of [E]xemption (C)." *Miller v. Bell,* 661 F.2d 623, 630 (7th Cir.1981). As a general rule, "[g]overnment records and official conduct [are accorded] a presumption of legitimacy." *United States Dep't of State v. Ray,* 502 U.S. 164, 179, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). If the mere allegation that a senior government official, like an independent counsel, is "untrustworthy" or incompetent was sufficient to warrant disclosure of private matters that the senior official happened to have compiled, then FOIA's privacy exemptions would be meaningless. *See id.*

Five separate government inquiries have determined that Vincent Foster committed suicide by a gunshot in Fort Marcy Park on July 23, 1993. The two OIC investigations and the two congressional inquiries each sprung from doubt as to the thoroughness and integrity of the preceding investigation(s). Yet each ultimately reached the same conclusions. And each found no wrongdoing in the preceding investigation(s). Intense media scrutiny of these investigations and of the circumstances of Mr. Foster's death has also reached the same conclusion and has uncovered no wrongdoing. Clearly, the public's interest in further investigating Vincent Foster's death has significantly diminished.

Favish's individual contentions that disclosure of the nine post-mortem Polaroids will serve the public's interest also fall short of justifying their disclosure. Three of Favish's contentions have no logical link to the nine post-mortem Polaroids. Favish disputes statements by Mr. Starr made in his report regarding which officials were present during Vincent Foster's autopsy. But the nine photographs at issue were taken at Fort Marcy Park and depict Mr. Foster's face and body only. They will not shed light on who was present during his autopsy at all. Favish also takes issue with the witness identifications of Mr. Foster's car in Fort Marcy Park at the time of his death. Again, the nine post-mortem photographs will not shed light on the basis for or veracity of these witness statements. Finally, Favish contends that there are possible discrepancies between the kind of gun that was reportedly found at the scene of Mr. Foster's death and the gun identified by his widow. Many of the 119 photographs already released to Mr. Favish depict the gun that was found at the scene of Mr. Foster's death and therefore speak directly to this aspect of the investigation. Nevertheless, because the photograph of Mr. Foster's right hand still clutching the gun has apparently already appeared in the national media and may shed further light on this aspect of the investigation, I believe that it should be released. The remaining nine post-mortem photographs, however, do not depict the gun and therefore should not be released for this purpose.

Favish's remaining contention is similarly insufficient to justify disclosure. Favish contends that the nine photographs of Vincent Foster's face and body are needed to explain purported deficiencies and inconsistencies in the Starr Report concerning the nature of Mr. Foster's wound.[12] The

---

**12.** For the first time on appeal, Favish also contends that the photographs at issue are needed to discern the correctness of two of Dr. Lee's conclusions: (1) that Vincent Foster's body was not "dragged" to the location where his body was found; and (2) that the post-mortem photographs possibly reveal bloodstains on the immediately surrounding vegetation. As purported proof that Dr. Lee's conclusion regarding "dragging" should not be believed, Favish points to the statements of the Park Police on the scene and Dr. Haut that Mr. Foster's body started to "slide down the hill" when they rolled him over to examine him and that they had to "pull" him back up. According to Favish, if Vincent Foster's body slid down the hill at all, Dr. Lee should have reported that there was some evidence of "dragging." At best, Favish's contention is speculative and amounts to nothing more than a difference of opinion.

As purported proof that Dr. Lee's statement concerning possible bloodstains on the vegetation was erroneous, Favish points to statements by a Park Police officer on the scene

Starr Report concluded that Vincent Foster died of a self-inflicted "gunshot [wound] through the back of his mouth exiting the back of his head" and that the exit wound was "three inches from the top of the head." *Starr Report* at 1, 31. Favish disputes this conclusion for two reasons: First, Favish contends that the Starr Report did not adequately explain the comment of a paramedic on the scene who viewed the body from a distance of two to three feet and initially reported that the *entrance* wound was on Mr. Foster's neck, near the jawline. Second, he contends that the Starr Report failed to mention that the report of the medical examiner at the scene, Dr. Donald Haut of the Fairfax County Medical Examiner's Office, was internally inconsistent. On one page of the report, Dr. Haut described Mr. Foster's wounds as "perforating gunshot wound mouth-head" and on the another page he described it as "mouth to neck." Favish claims that the statement on Dr. Haut's report that the wound was "mouth-head" was the product of an alteration.

As the D.C. Court of Appeals explained in *AIM* when it considered and rejected these same contentions:

> Depending on what one views as the "top" of the head, the discrepancy between [the statement that the exit wound was three inches from the top of the head] and assertions of a neck exit wound may be matters of characterization. Further, the paramedic, after reviewing photos (presumably belonging to the disputed set), admitted that he may have been mistaken about Foster having a neck wound. *Starr Report* at 34 n. 77. Dr. Haut's report is internally inconsistent, with one assertion consistent with the later reports from Congress and two independent counsels. AIM asserts that the consistent entry on Dr. Haut's report was the product of an alterna-

tion. . . . Without more, however, [there is] hardly "compelling evidence" that any government actor has behaved illegally. At least while completing that part of the report, Dr. Haut presumably thought "head" correct. . . .

When multiple agencies and personnel converge on a complex scene and offer their hurried assessments of details, some variation among all the reports is hardly so shocking as to suggest illegality or deliberate government falsification. Nor does it suggest that the congressional or independent counsel inquiries got anything wrong regarding Foster's wounds. The Starr report is altogether credible in its assertion that the photos are "[s]ome of the best evidence" of the nature of Foster's wounds . . . and those who have viewed them have concluded that Foster suffered an entrance wound in the mouth and an exit wound in the back of the head. The likelihood that the photos contradict the statements of all four investigating agencies [i.e., the Park Service, the FBI, Congress, and the OIC] seems remote. While we agree that falsification by the agencies would show government illegality . . . there is no persuasive evidence of such falsification, much less compelling evidence.

*AIM*, 194 F.3d at 124. I agree.

### III. CONCLUSION

The description in the OIC's Vaughn index of the ten post-mortem Polaroid photographs at issue is sufficiently detailed for the district court to resolve the issues in this case. Consequently, remand for in camera review is unnecessary.

Moreover, I am persuaded that the public's interest in the OIC's two investigations of Vincent Foster's death is more

---

that "there was no blood splatter on the plants or trees surrounding the decedent's head" and a statement by Dr. Haut that he could recall no blood "on the vegetation around the body." Dr. Lee did not conclude that there were bloodstains on the vegetation,

only that after viewing an enlarged, close-up view of the vegetation, there may have been bloodstains. *See Starr Report* at 59. Again, Favish's contention amounts to little more than a difference of opinion, with no suggestion of official misconduct or wrongdoing.

than adequately served by the release of the 118 photographs that Favish has already obtained from the OIC, the photograph of Foster's eyeglasses that the district court ordered released to him, and the photograph of Foster's right hand clutching the gun that I believe should be released to him as well. The public's interest in disclosure of the remaining nine, never-before-released post-mortem Polaroid photographs does not outweigh the privacy interests of Vincent Foster's surviving family in their nondisclosure. Accordingly, under FOIA's Exemption 7(C), the government has established that their production could reasonably be expected to constitute an "invasion of privacy [that] is 'unwarranted.'" *Reporters Comm.*, 489 U.S. at 780, 109 S.Ct. 1468.